**MARSANN COMPANY, a sole proprietorship, Plaintiff-Appellant,**

v.

**BRAMMALL, INC., a corporation, Defendant-Appellee.**

No. 85–1580.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Oct. 8, 1985.

Decided April 28, 1986.

Thomas J. Gundlach, Law Offices of Thomas J. Gundlach, San Francisco, Cal., for plaintiff-appellant.

John L. Cooper, Farella, Braun & Martel, San Francisco, Cal., for defendant-appellee.

Before CHOY, SNEED, and BRUNETTI, Circuit Judges.

SNEED, Circuit Judge:

In this case, we must decide what is a plaintiff's burden of proof for establishing the element of predation in a predatory pricing claim when the alleged predatory price is afforded only to a select customer. The principal question presented is whether the average variable cost of a product, the standard against which a price is compared to establish predation, must be determined from costs uniquely incurred in the production of the particular items purchased at the allegedly predatory price, or from costs associated with the production of the total output of the product. We hold that the relevant costs are the former, *viz.* those uniquely incurred to produce the items sold at the challenged price. However, for another reason we reverse and remand for further proceedings.

## I.

Plaintiff Marsann Company and defendant Brammall, Inc. provide on-site roll-straightening services to companies that handle large rolls of various materials such as paper, steel, and tin. Essentially, Marsann and Brammall fix the damaged central core of these rolls so that they will fit onto processing machines. Brammall is a large corporation, a division of which performs roll-straightening services nationwide. Marsann is a sole proprietorship that competes for business with Brammall in several western states.

Before September 1, 1983, Marsann performed roll-straightening work at the United States Steel mill in Pittsburg, California, charging 1.5 cents per pound, with a minimum charge of $275 per roll. Brammall then acquired the United States Steel account, charging 1 cent per pound.

Marsann brought suit under section 2 of the Sherman Act, 15 U.S.C. § 2, alleging that Brammall had attempted to monopolize the roll-straightening business in the western region by offering selected customers a predatory price for those services. Marsann contends that the 1 cent per pound charged to United States Steel was a predatory price. Marsann relies primarily on a report prepared by its expert, Mr. Cropper, which found that the 1 cent price was .514 cents below Brammall's average variable cost (AVC) and thus presumed to be predatory under the law of this circuit. *See Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377, 1386 (9th Cir.), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983). Cropper determined Brammall's AVC by studying costs of the company's entire roll-straightening division over the four-month period in which Brammall performed its work at United States

Steel. He then classified costs as fixed or variable, dividing the total variable costs by output to produce the AVC figure. In effect, he assumed that the variable costs attributable to each unit of production were the same without regard to the particular circumstances under which that unit of production took place. Marsann admits that Cropper did not examine the actual costs of the United States Steel job alone. Indeed, it claims that the cost figures per job would be impossible to ascertain because of the nature of Brammall's accounting system.

Brammall moved for summary judgment, asserting that Marsann had failed to meet its burden of proof because it had not established marginal costs uniquely incurred by Brammall at the United States Steel plant. Marsann argued that it need only establish average variable cost for the product overall, rather than costs specifically related to the United States Steel job. The district court entered summary judgment in favor of Brammall, stating that despite the "harsh results," plaintiff's burden of proof was to measure "the variable costs of performing services at U.S.S. only." Marsann appeals the burden of proof standard applied by the district court. For a reason stated hereafter, we reverse and remand.

## II.

▆ Under a claim of attempted monopolization by predatory pricing, a plaintiff must prove four elements: (1) specific intent to control prices or destroy competition in some part of commerce; (2) predatory or anticompetitive conduct directed to accomplishing the unlawful purpose; (3) a dangerous probability of success; and (4) causal antitrust injury. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1027 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103

S.Ct. 58, 74 L.Ed.2d 61 (1982); *California Computer Products, Inc. v. IBM*, 613 F.2d 727, 736 (9th Cir.1979).[1] Because it is unreasonable to expect plaintiffs in most cases to produce evidence of anticompetitive intent by sophisticated defendants, *see Inglis*, 688 F.2d at 1028 & n. 6, we have allowed juries to infer the requisite intent from evidence of "the relationship between the defendant's prices and costs." *Id.* at 1034. While price generally is known in a predatory pricing case, the usually more troublesome issue is that of costs. That is, what costs must be compared with the alleged predatory price to establish predation?

Obviously the method used to determine "cost" will affect its amount. Each additional unit of production will have a cost when, in determining cost, *all* costs of production are divided by the total number of units produced. On the other hand, an additional unit of production might entail no costs that would not have been incurred in any event by the production of all units other than this last additional unit. Under those circumstances the "marginal cost" of that last unit is zero. Usually common sense tells us that the marginal cost of an additional unit is greater than zero even if we can not fix that cost precisely through accepted accounting methods.

Average variable cost functions as a surrogate for marginal cost. It is arrived at by apportioning to that product, which if priced predatorily would tend to eliminate competition, those costs that would not be incurred were that product not produced. This case presents not only the problem of determining average variable costs but also of fixing the identity of the "product" for which we seek to establish average variable costs. Marsann's theory of recovery in effect assumes that the "product" is roll-straightening services whenever and for

---

**1.** We do not feel that *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), undermines these precedents. As the Supreme Court expressly noted, the *Matsushita* litigation does not raise issues as to the relation between cost and price that justifies an inference of conduct de-

signed to secure monopoly power. *Id.*, 106 S.Ct. at 1355 n. 8. The Supreme Court's opinion discusses only the amount of evidence required to allow a factfinder to infer the existence of a conspiracy punishable under section 1 of the Sherman Act, 15 U.S.C. § 1. This case, of course, arises under section 2, 15 U.S.C. § 2.

whomever performed. In our view the district court correctly identified the "product" as being straightening work at the United States Steel mill in Pittsburg, California.

The governing precedent in this circuit on product definition in predatory pricing cases is *Janich Bros. v. American Distilling Co.*, 570 F.2d 848, 856–57 (9th Cir.), *cert. denied*, 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978). In that case, we analyzed charges that a distiller had attempted to drive competitors out of the market by charging predatorily low prices on half-gallon size bottles of private label gin and vodka. We concluded that this allegation would not support a charge of predatory pricing because a low price on the half-gallon size alone "would not be likely to drive out or exclude rivals from sales of the product line as a whole." *Id.* at 856. We also offered a general test for product definition: "[T]he product must be such that if predatorily priced, rivals are likely to be driven out of the market or excluded, allowing the firm to raise prices." *Id.* This definition is not easy to apply. However, when forced to choose between Brammall's entire roll-straightening servicing endeavor and those services rendered to United States Steel, the latter appears the appropriate choice. United States Steel is a customer of significant size in the marketplace, even if it is not the largest customer.

Brammall has clearly secured a competitive advantage by securing this account. Under the law of this circuit, we hold that they must defend the price they set to United States Steel, not the price they set to all customers.[2]

In *Inglis*, 668 F.2d at 1014, we emphasized that

> Predation exists when the justification of these prices is based, not on their effectiveness in minimizing losses, but on their tendency to eliminate rivals and create a market structure enabling the seller to recoup his losses. This is the ultimate standard, and not rigid adherence to a particular cost-based rule, that must govern our analysis of alleged predatory pricing.

668 F.2d at 1035. In this case, the price in question is the price to United States Steel. To evaluate properly the economic motivations of Brammall, we must isolate, as a separate product, the sales to United States Steel.

■ To this point an affirmance of the judgment of the district court would appear to be proper. However, we must now decide whether Marsann's inability to fix average variable costs of that "product," assuming such an inability exists, entitles Brammall to summary judgment. This presents a close question. We have decid-

---

2. The following example illustrates that the "product" can be a portion of the total output of production of identical units. Assume a seller manufactures widgets, each of which is identical to every other. The selling price is $1.25. Dividing total costs by the number of widgets manufactured and sold yields a $1 cost per widget. If production declines because of reduced demand and costs remain substantially the same, two things occur: the total cost of each widget increases; and surplus capacity comes into existence. To use this capacity the seller-manufacturer may reduce his selling price to all customers in the hope that demand will increase and his excess capacity will again become productive. Alternatively, the seller-manufacturer may engage in differential pricing, as Brammall has done in this case. That is, it may maintain the $1.25 price to all existing customers but offer widgets at 50¢ to X, Y, and Z, potentially new customers. Should X, Y, and Z agree to buy widgets at 50¢, at least a portion of

the excess capacity will be put back into use. Also it is likely that some costs not related to the then existing surplus capacity will be incurred in servicing those three customers. These costs are a portion of the variable costs of the widgets sold to X, Y, and Z. Another portion will consist of the difference between the cost of "using" the surplus capacity and the cost of permitting that capacity to remain idle. But the costs, whatever their nature, incurred in servicing all customers other than X, Y, and Z are not a portion of these variable costs.

This sort of differential pricing can lead to charges of predatory pricing. To make the charge stick the accuser may assert that the price of 50¢ is below the seller-manufacturer's total cost. In our example this would be true. The 50¢ price, however, would not be presumptively reprehensible under the antitrust laws, provided it covers the seller's average variable costs.

ed to reverse and remand because of certain teachings in *Inglis,* 668 F.2d at 1014. There we said, "[a] price should be considered predatory if its anticipated benefits depended on its tendency to eliminate competition." *Id.* at 1034. A price may be so characterized even though it is impossible to establish that it is below either the "product's" marginal or average variable cost. It follows, therefore, that the district court erred in entering summary judgment in favor of Brammall solely on the basis of Marsann's inability to establish the average variable costs of Brammall's servicing of United States Steel.[3]

On the other hand, neither does Marsann's showing entitle it to summary judgment. Its cost figures are not in any way related to the "product" in question. For aught the record reveals, this product used almost entirely the surplus capacity of Brammall, with the result that its average variable costs were considerably below the 1¢ per pound price. Conversely, this "product" may have required the acquisition of substantial additional capacity—with the result that only a predatory motive could justify the 1¢ per pound price.

The point is that the record is too incomplete at this point to permit affirmance of the district court's grant of summary judgment to Brammall. We remand to the district court to give the parties an opportunity to demonstrate in a procedurally appropriate fashion the relationship between the price charged to United States Steel, and the costs properly associated with the provision of services to United States Steel as well as to permit Marsann to attempt to show by means other than cost-price comparisons that the anticipated benefits of Brammall's price *"depended on its tendency to eliminate competition." Inglis,* 668 F.2d at 1034.

REVERSED AND REMANDED.

CHOY, Senior Circuit Judge, concurring:

I agree that the decision of the district court to grant summary judgment against the plaintiff, Marsann Company, should be reversed. However, I cannot support the reasoning employed by the majority in affirming the district court's definition of the product. I would hold that the district court erred by defining the product as the straightening services sold specifically to United States Steel, and thereby incorrectly placed upon Marsann the burden of proving costs related to that specific project.

It is true that Brammall charged its alleged predatory price only to one customer, United States Steel, and that Marsann suffered from the loss of that customer. However, the majority's attempt to carve out a "product" from the simple fact that the predatory pricing involved only the United States Steel account rests on questionable authority and introduces unnecessary complications to existing predatory pricing doctrine in this circuit.

First, the majority applies *Janich Bros. v. American Distilling Co.,* 570 F.2d 848, 856–57 (9th Cir.1978), as governing precedent on product definition, which in my view provides no support for the majority's position. In defining the "product" for the purpose of assessing below cost pricing, the *Janich* court chose between *two, different* goods, i.e. half-gallon bottles of gin and vodka and all-sized bottles. In the instant case, as the majority concedes, there is but a *single, undifferentiated* good, i.e. roll straightening services. *See* Majority Opinion, at 614 n. 2.

The majority relies simply on the fact that Brammall charged differential prices for its good (roll straightening services). "[T]he price in question is the price to United States Steel." Majority Opinion, at 614. This leads to my second and more important objection to the majority opinion—that the majority conclusion makes proof of predatory pricing more difficult in predatory price discrimination cases than in across-the-board predatory pricing cases.

**3.** In *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* —— U.S. ——, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court expressly refused to consider whether proof of below cost pricing is necessary for antitrust liability on a predatory-pricing theory. *Id.,* 106 S.Ct. at 1355 n. 9.

In the instant case, as well as in any predatory price discrimination claim, the challenged conduct is not the general pricing scheme, but the fact that a particular alleged predatory price has been charged. Specifically, plaintiffs will complain that they were unable to sell a good to a particular customer because the defendant made that same good available at an alleged predatory price. The majority would define the "product" as that portion of a defendant's production that was sold at a predatory price, since it is the loss from that particular sale which tends to eliminate a rival. In the language of the majority, "To evaluate properly the economic motivations of [a defendant], we must isolate, as a separate product, the sales [made at the predatory price]." Majority Opinion, at 614.

This misuse of product definition in price discrimination cases imposes upon aggrieved plaintiffs, like Marsann, an almost impossible burden of proving predatory intent. In this circuit, predatory intent can be inferred from proof that the average variable cost for a product exceeded the price charged. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 668 F.2d 1014, 1036 (9th Cir.1981), *cert. denied*, 459 U.S. 825, 103 S.Ct. 58, 74 L.Ed.2d 61 (1982). Average variable cost is the sum of all variable costs divided by output. *Janich*, 570 F.2d at 858 n. 11; *see generally* P. Areeda and D. Turner, *Antitrust Law* ¶¶ 712, 715.2a, 715d (1978 and 1982 Supp.). Average variable cost is employed as a proxy for marginal cost—the actual, short-run, economic cost of the particular item sold—since conventional business records rarely provide the data necessary to isolate the cost of a single, fungible item. *See Janich*, 570 F.2d at 858. By defining as the "product" a portion of total production of a fungible good, the majority requires the plaintiff to isolate costs related specifically to that portion of production. This places upon the plaintiff an impossible burden, similar to that of proving marginal cost. The majority, in effect, defines the

"product" as the marginal unit of production, and thereby requires proof of the "average variable cost" of the marginal unit of production. Thus, under the guise of product definition, the majority strips all meaning from the average variable cost standard in predatory pricing cases, where the alleged predatory price is charged to particular customers rather than across-the-board.

In a lengthy footnote, the majority attempts to explain how a portion of the production of a good can have an average variable cost different from that of the good itself. *See* Majority Opinion, at 614 n. 2. Without commenting on its correctness, this economic analysis is, in my view, irrelevant to the discussion of product definition. While there may be a dispute about what cost categories should be considered variable in determining the average variable cost figure, the "product" is in any case the good (here, roll straightening services), not a portion of the total output of the good.[1]

Moreover, the possibility that surplus capacity or any other factor exists, suggesting the appropriateness of a downward adjustment in the average variable cost figure presented by Marsann, is irrelevant to the question of whether Marsann has established a prima facie case of predation. These are defenses, for which Brammall bears the burden of proof. Indeed, *Inglis* explicitly holds that "[e]ven when excess capacity exists, pricing below average variable cost, to repeat, is sufficiently questionable to support the inference that the prices were designed to eliminate competition." 668 F.2d at 1036. Thus, the majority errs in requiring the *plaintiff* to merge excess capacity analysis into its calculation of average variable cost.

Finally, I comment briefly on the majority's decision to reverse the district court grant of summary judgment. The decision appears charitable, in light of Marsann's admission that conventional business

---

1. A dispute about what cost categories should be considered variable presents a factual question, which must be decided by the jury. *See Inglis*, 668 F.2d at 1038.

records make it impossible to come up with cost figures related to the "product" as defined by the majority. However, the majority correctly notes that *Inglis* does not foreclose a finding of predation in the absence of a cost/price comparison. Nevertheless, allowing Marsann to prove predation without cost-based evidence is of little comfort to small businesses like Marsann, who may be victims of predatory price discrimination. First, "smoking gun" evidence is not likely to exist. And second, plaintiffs who cannot show that price is below total cost (and here, Marsann cannot show any cost) must prove a "compelling" case of predation, arguably an impossible burden. *See Transamerica Computer Co. v. IBM Corp.*, 698 F.2d 1377, 1390 (9th Cir.) (Lucas, J., concurring), *cert. denied*, 464 U.S. 955, 104 S.Ct. 370, 78 L.Ed.2d 329 (1983).

Thus, I would treat equally cases involving discriminatory predatory pricing and across-the-board predatory pricing. In the instant case, Marsann presented evidence that Brammall's average variable cost for roll straightening, calculated from costs associated with Brammall's entire roll straightening division, exceeded the price charged to United States Steel. Because in my view the product is roll straightening, the evidence presented was sufficient to establish a prima facie case of predation. Surplus capacity and other disputes over which categories of costs should be considered variable are jury questions under *Inglis*. Thus, the district court's narrow definition of the product and grant of summary judgment against Marsann were in error, and the case should be remanded for further proceedings in accordance herewith.