892 F.2d 1355
 1989-2 Trade Cases P 68,881, 17 Media L. Rep. 1465
 William Royce MORGAN and Kenneth H. Lipps, d/b/a Ozark
Graphic and Merilyn Royce Morgan, Appellees,
v.
Chester L. PONDER and Dorothy K. Ponder, d/b/a The Prospect
News Publishing Co., Appellants.
 Nos. 88-1364 and 89-1309.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 13, 1989.
Decided Dec. 29, 1989.
 
 James V. O'Brien, St. Louis, Mo., for appellants.
 Peter W. Herzog, Jr., St. Louis, Mo., for appellees.
 Before LAY, Chief Judge, BOWMAN and MAGILL, Circuit Judges.
 LAY, Chief Judge.
 
 
 1
 This is an appeal from a judgment reflecting that owners of a small town newspaper monopolized the local newspaper advertising market through predatory pricing in violation of section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2 (1982). We find insufficient evidence to support the jury's verdict and the resulting judgment. We reverse and remand the case to the district court[1] with directions to enter a judgment for the defendants.
 
 I. Background
 
 2
 The setting of this dispute is Doniphan, Missouri, a town of around 1900 people and the seat of Ripley County. Ripley County has a population of approximately 12,000 and a per capita income among the lowest in the country. For over 100 years, a single newspaper, the Prospect-News, served the Ripley County area. Chester and Dorothy Ponder purchased the Prospect-News in 1961 and have continued to run it as a weekly paid-subscription newspaper since that time. The newspaper's advertising includes classified ads as well as larger ads by local merchants. It also includes "legal advertising." Legal advertising consists of notices of such matters as name changes, adoptions, court-ordered property sales, and probate settlements. Legal advertising also includes notices required by law to be published by local agencies and municipalities. During the years leading up to this dispute, 1974 through 1979, the Ponders earned net profits from the Prospect-News ranging from $9000 to $15,000 per year.
 
 
 3
 William Royce Morgan, Merilyn Royce Morgan, and Kenneth Lipps began publishing a free-distribution weekly advertising shopper in 1974.[2] They distributed their shopper, the Ozark Graphic Weekly Shopper (Ozark Shopper), by mail throughout Ripley County and nearby communities. The Ozark Shopper contained 70 to 80% advertising. It therefore competed with the Prospect-News for local advertising. The Ozark Shopper attracted the advertising of several local merchants. These included two local grocery stores, Doniphan AG Market (AG Market) and Jamison's IGA, both of which placed weekly two-page ads in the Ozark Shopper. According to Mr. Lipps, the Ozark Shopper's business manager, to stay in business the Ozark Shopper needed at least one grocery store advertiser.
 
 
 4
 In January, 1980, the Ozark Shopper's owners began publishing their own weekly paid-subscription newspaper, the Ozark Graphic. They temporarily ceased publication of the Ozark Shopper to devote a full effort to this new paid-subscription newspaper. A few months later, however, they resumed publication of the Ozark Shopper. The Ponders, now faced with competition from both the Ozark Shopper and Ozark Graphic, began publishing their own free-distribution weekly shopper, the Prospector, a year later. Thus, by mid-1981 the parties were engaged in direct competition on two fronts. Each published a weekly paid-subscription newspaper and a free advertising shopper.
 
 
 5
 A fierce competitive war for local advertising and paid subscriptions ensued. As a result of the competition the Ozark Shopper lost most of its merchant advertisers to the Prospector and was forced to cease publication in June 1982. Later, in 1983, the Morgans sold the Ozark Graphic for ten dollars.[3] The new owners carried on publication of the Ozark Graphic for two years before closing in 1985. Thereafter, the Morgans, along with Lipps, commenced this antitrust action alleging that the Ponders had engaged in predatory pricing and were guilty of monopolizing the local newspaper advertising market. A jury verdict resulted in an award to the plaintiffs of $60,000 (now trebled), attorney fees in the sum of $50,000, and costs. The district court denied defendants' motion for judgment notwithstanding the verdict, and this appeal followed.
 
 
 6
 Before 1980 the Prospect-News was the area's only publication qualified to publish legal notices, and therefore faced no competition for legal advertising. When the Ozark Graphic emerged on the scene in 1980, however, it also became qualified to publish legal advertising. Taking advantage of this new competition, Ripley County announced in early 1980 that it would accept sealed bids for its legal advertising. The Ozark Graphic bid 98 cents per column inch;[4] the Prospect-News bid 48 cents. With its low bid, the Prospect-News was able to retain the county's legal advertising business.[5] Before 1980, the Prospect-News had been charging the county $1.22 for legal advertising.[6]
 
 
 7
 Evidence also suggests that the Prospect-News lowered prices on other types of legal advertisements to other customers. For instance, both defendants indicated that prices for estate settlement notices dropped from between thirty and forty dollars to as low as $12.50. Plaintiffs also recite evidence of a February 1980 letter from Chester Ponder to a local clerk of court. The letter announces a rate of $1.05 per column inch for items such as quiet title action notices, and fixed rates of $25 per item for other types of notices such as adoption and probate settlement. The last sentence of the letter reads: "If the Ozark Graphic submits a lower bid, we will reduce our rates accordingly. WE WILL NOT BE UNDERBID." Plaintiffs argue this statement and defendants' bidding practices show predatory pricing in legal advertising.
 
 
 8
 Plaintiffs' also allege predatory pricing in the sale of merchant advertising. This allegation centers on the rate the Ponders offered AG Market to induce it to switch its weekly two-page ad from the Ozark Shopper to the Prospector. In October 1981, the Prospector quoted AG Market a weekly price of $269--substantially below the $400 price AG Market was paying the Ozark Shopper at that time. AG Market switched over. After it did, other merchants began switching their ads from the Ozark Shopper to the Prospector, although plaintiffs cite no evidence suggesting any of these merchants received below-cost rates. One merchant testified, however, that the Ponders' son Greg assured him the Prospector would "do whatever it takes" to get his advertising business.[7] Another testified that Bud Ponder told him he could "name his own price" if he switched to the Prospector.[8]
 
 
 9
 To buttress their allegations of predatory pricing, plaintiffs cite what they view as a suspicious price-profit pattern. The Ponders' federal tax returns show a substantial drop in net business income during the period of competition. The Ponders' 1980 net income was only $646, down from a pre-competition average of approximately $11,000 per year. In 1981, the year they began publishing their shopper, the Ponders sustained a net loss of approximately $10,000. The Ponders' income began to rise again in 1982. By 1986, the year after the Ozark Graphic ceased operations, it had risen to approximately $49,000. Evidence also indicates that defendants substantially increased their rates for all types of advertising after the Ozark Shopper and Ozark Graphic ceased operations. This price-profit pattern, plaintiffs argue, demonstrates a typical scheme of predation: foregoing present profits with the intent of recouping even more profits once the competition is gone.
 
 II. Discussion
 
 10
 In order to establish a § 2 Sherman Act violation a plaintiff must show that: (1) the defendant possessed monopoly power in the relevant market; (2) the defendant willfully acquired or maintained this monopoly power by anticompetitive conduct. United States v. Grinnell Corp., 384 U.S. 563, 570-71, 86 S.Ct. 1698, 1703-04, 16 L.Ed.2d 778 (1966); Paschall v. Kansas City Star Co., 727 F.2d 692, 695-96 (8th Cir.) (en banc), cert. denied, 469 U.S. 872, 105 S.Ct. 222, 83 L.Ed.2d 152 (1984). Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition. General Indus. Corp. v. Hartz Mountain Corp., 810 F.2d 795, 804 (8th Cir.1987).
 
 
 11
 The theory of predatory pricing as anticompetitive conduct is demonstrated "in cases in which a single firm, having a dominant share of the relevant market, cuts its prices in order to force competitors out of the market, or perhaps to deter potential entrants from coming in." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 584 n. 8, 106 S.Ct. 1348, 1355 n. 8, 89 L.Ed.2d 538 (1986). The difficulty, of course, is distinguishing highly competitive pricing from predatory pricing. A firm that cuts its prices or substantially reduces its profit margin is not necessarily engaging in predatory pricing. It may simply be responding to new competition, or to a downturn in market demand. Indeed, there is a real danger in mislabeling such practices as predatory, because consumers generally benefit from the low prices resulting from aggressive price competition. See, e.g., Barry Wright Corp. v. ITT Grinnell Corp., 724 F.2d 227, 231 (1st Cir.1983).
 
 A. Predatory Intent
 
 12
 This court has realized the futility in attempting to discern predatory conduct solely through evidence of a defendant's "predatory intent." See Henry v. Chloride, Inc., 809 F.2d 1334, 1344 (8th Cir.1987);[9] Conoco, Inc. v. Inman Oil Co., 774 F.2d 895, 904 n. 6 (8th Cir.1985) (attempted monopolization); see also A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc., 881 F.2d 1396, 1402 (7th Cir.1989) (eliminating intent as basis for predatory pricing liability); P. Areeda & H. Hovenkamp, Antitrust Law p 714.2 (Supp.1988) (suggesting same). Evidence of predatory intent alone can be ambiguous or misleading. Henry, 809 F.2d at 1344; Conoco, 774 F.2d at 904 n. 6.
 
 
 13
 The statements made by Bud and Greg Ponder--"we will not be underbid"; "we'll do whatever it takes"; "name your price"--are prime examples of remarks which, if portrayed by plaintiffs' attorneys as damning evidence of predatory intent, may lead juries to erroneously condemn competitive behavior. See A.A. Poultry, 881 F.2d at 1402. These are phrases often legitimately used by business people in the heat of competition. They provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition. Thus, as our cases have made clear, evidence of statements such as these will not relieve a plaintiff of the burden of proving predation through a separate showing of predatory conduct. See Henry, 809 F.2d at 1344; Conoco, 774 F.2d at 904 n. 6.
 
 B. Price-Profit Pattern
 
 14
 We next briefly address what plaintiffs consider the typical pattern of a predatory pricing scheme: price cuts and lower profits followed by higher prices and higher profits once the competition is gone. There is little doubt that this is the typical pattern of a successful predator. See, e.g., Matsushita, 475 U.S. at 588-89, 106 S.Ct. at 1356-57. Yet, it is just as plainly the pattern of a successful competitor in a concentrated market. As one court has stated:
 
 
 15
 Competition is a ruthless process. A firm that reduces cost and expands sales injures rivals--sometimes fatally. The firm that slashes costs the most captures the greatest sales and inflicts the greatest injury. The deeper the injury to rivals, the greater the potential benefit. These injuries to rivals are byproducts of vigorous competition, and the antitrust laws are not balm for rivals' wounds. The antitrust laws are for the benefit of competition, not competitors.
 
 
 16
 Ball Memorial Hosp. v. Mutual Hosp. Ins., Inc., 784 F.2d 1325, 1338 (7th Cir.1986) (citations omitted).
 
 
 17
 We therefore find the evidence of defendants' pattern of profits and prices no less ambiguous and misleading than the evidence of so-called "predatory intent." Although evidence that the Ponders are able to earn substantial profits in the absence of direct competition may assist in showing that they presently possess monopoly power,[10] it offers no help in establishing the prong of the monopolization test at issue here: whether monopoly power was achieved by predatory conduct. As we indicated in Henry, objective cost analysis is the crucial component in a prima facie case of predatory pricing. 809 F.2d at 1344-46.
 
 C. Cost Analysis
 
 18
 This court has utilized "average variable cost" and "average total cost"[11] as rough markers for determining whether a price is predatory. In Henry we held that because "at some point competitors should know for certain they are pricing legally," prices above average total cost are legal per se. 809 F.2d at 1346. On the other hand, average variable cost is a marker of rebuttable presumptions. At prices above average variable cost the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive. Id. At prices below average variable cost, the burden of showing non-predation falls on the defendant. Id. A plaintiff, of course, has the initial burden of establishing that the defendant's prices are below one of these cost markers.
 
 1. The AG Market Rate
 
 19
 The sole evidence of defendants' cost of producing a page of advertising in the Prospector came from defendants' own expert, Austin Mitchell. Mr. Mitchell, a certified public accountant, testified that the Prospector's per page average total cost was 78.3 cents per column inch. The $269 (78.5 cents per column inch) price charged to AG Market is just above this cost figure. Plaintiffs produced neither their own expert, nor any analysis to suggest an alternative cost figure. Plaintiffs' counsel merely suggested to Mr. Mitchell on cross-examination that in computing total cost he failed to consider labor costs for newsgathering and typesetting. Mr. Mitchell denied this.
 
 
 20
 Plaintiffs rely heavily on Mr. Lipps' testimony that "it was impossible to make money at this rate." They also rely on the fact that defendants' rate was substantially below their own. This evidence, however, is too meager to support an inference that the price charged to AG Market was predatory. Even if it were somehow enough to permit the jury to find that the rate was below average total cost, such a showing merely prevents operation of the per se rule of legality. Plaintiffs were still faced with the task of proving that the rate fell below defendants' average variable cost or, alternatively, of overcoming a strong presumption of competitive pricing. See Henry, 809 F.2d at 1344-46 (prices between average variable and average total cost are generally "competitive and socially optimal"). Under no view of the evidence can it be said that they did either. The sole evidence of the average variable cost of advertising suggests it was below the 78.5 cent rate charged to the AG Market.[12] Mr. Lipps' conclusory testimony does little to overcome this. Moreover, plaintiffs point to no evidence rebutting the presumption that the price was competitive. As we have indicated, the statements purportedly showing "predatory intent" are of no help. Nor is evidence suggesting that defendants may now stand as monopolists in the local market of any assistance. As we have noted, that plaintiffs have gone out of business just as easily suggests they lost a competitive fight as it suggests they were victims of predatory practices. Accordingly, we find no evidentiary basis to support the charge that the AG Market rate was predatory.[13]
 
 2. Legal Advertising
 
 21
 Plaintiff's second and only other allegation of predatory pricing targets the Prospect-News' legal advertising. Dorothy Ponder admitted that the county rate reduction from $1.22 to 48 cents may have reduced the Prospect-News' gross revenue by two or three thousand dollars. However, she also stated: "If the Ozark Graphic got the bid, we wouldn't have had a coin from it." This simple statement capsulizes the economic issue at the heart of a predatory pricing case. At some price, presumably, defendants would have been better off without the county legal advertising: the variable or "incremental" cost of producing it would have exceeded the benefit of having it. Defendants maintain that this point was never reached. Chester Ponder testified that he could still make money at the 48 cent rate because there was little incremental cost to legal ads other than the printing cost.[14] He also testified that the legal advertising was important to him because of the prestige it added to the newspaper. Therefore, defendants maintain, it made legitimate business sense to print the county's legal ads, even at the 48 cent rate.
 
 
 22
 In response, plaintiffs rely again on the testimony of defendants' own expert, Mr. Mitchell. Even though Mr. Mitchell's cost analysis related solely to the Prospector and not to the Prospect-News, plaintiffs argue that the jury could have reasonably inferred that the cost of producing a page of advertising in either publication was basically the same. Therefore, the argument goes, because the 48 cent rate was substantially below Mr. Mitchell's average total cost figure of 78.3 cents, the jury could have concluded that it was also below average variable cost, whatever that figure might be.[15]
 
 
 23
 We see a fundamental flaw in this argument. Plaintiffs do not cite evidence suggesting defendants' overall price structure was predatory. Rather, the evidence plaintiffs rely on to establish predation in legal advertising addresses merely the 48 cent bid for Ripley County legal advertising.[16] Plaintiffs, however, have made no attempt to separate the variable costs of this legal advertising from the variable costs of the total operations. Nor have they shown that the low price charged to this single customer had any significant anticompetitive impact on their newspaper.
 
 
 24
 Courts have been wary of plaintiffs' attempts to prove predatory pricing through evidence of a low price charged for a single product out of many, or to a single customer. See Directory Sales Management Corp. v. Ohio Bell Tel. Co., 833 F.2d 606, 614 (6th Cir.1987) (relevant area of inquiry should be defendant's "operations taken as a whole") (emphasis in original); C.E. Services, Inc. v. Control Data Corp., 759 F.2d 1241, 1247 (5th Cir.) (distinguishing harm to a full-line competitor from harm to competitor dealing primarily in product priced at predatory level), cert. denied 474 U.S. 1037, 106 S.Ct. 604, 88 L.Ed.2d 583 (1985); Bayou Bottling, Inc. v. Dr Pepper Co., 725 F.2d 300, 305 (5th Cir.) (no antitrust injury established by low price charged for single product where both competitors are full-line producers), cert. denied, 469 U.S. 833, 105 S.Ct. 123, 83 L.Ed.2d 65 (1984); Buffalo-Courier Express, Inc. v. Buffalo Evening News, Inc., 601 F.2d 48, 57 (2d Cir.1979) (price cut and promotional "give-a-way" created no danger that competing newspaper would be "swiftly removed from the scene"); Janich Bros., Inc. v. American Distilling Co., 570 F.2d 848, 856 (9th Cir.1977) ("product" for purposes of predation analysis must be defined "such that if predatorily priced, rivals are likely to be driven out of the market or excluded"), cert. denied 439 U.S. 829, 99 S.Ct. 103, 58 L.Ed.2d 122 (1978); see also Marsann Co. v. Brammall, Inc., 788 F.2d 611, 613-14 (9th Cir.1986) (average variable cost analysis must focus on those costs uniquely incurred to produce the items sold at the challenged price). Although these cases differ somewhat in their analytical approaches, all focus on the basic question of whether the alleged predatory act poses a genuine threat to the overall competition.
 
 
 25
 We have previously recognized this principle. In Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582 (8th Cir.1987), cert. denied, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988), a food distributor attempted to demonstrate below cost pricing on only four of 180 competing items. We found this insufficient to support an inference that the other 176 items were priced below cost. Id. at 597. In addition, we found that the plaintiff "neither alleged nor submitted evidence to support the inference that its difficulty in selling these four items had any measurable impact on its overall viability as a competitor." Id.
 
 
 26
 Here, plaintiffs submitted their entire case on the theory that the Ponders monopolized the local market for "newspaper advertising." The trial judge used this market definition in his instructions to the jury. Yet plaintiffs purport to demonstrate below-cost pricing in only two isolated instances: the bid for Ripley County legal ads and the AG Market grocery ad. As we have discussed supra, the cost evidence regarding the grocery ad is sorely insufficient. As to legal advertising, both defendants indicated that it is significantly less costly to produce than other types of advertising, and that the incremental cost of adding the county's legal ads to the newspaper is minimal. Plaintiffs failed to submit any evidence to challenge this claim. They simply asked the jury to rely on Mr. Lipps statement that he did not believe the 48 cent rate was profitable, and to apply to the Prospect-News Mr. Mitchell's analysis of the Prospector's average total cost. This, we think, is insufficient to show that the 48 cent rate was predatory.[17]
 
 
 27
 We also find insufficient evidence that the Ozark Graphic's failure to secure Ripley County's legal advertising had any more than a negligible impact on its viability as a competitor. See Lomar, 824 F.2d at 597. Plaintiffs submitted no evidence to counter Dorothy Ponder's testimony that county legal advertising constitutes only a small part of legal advertising, and even a smaller part of overall advertising. Indeed, Mr. Lipps himself admitted that he believed the 1980 bidding covered only the county's publication of a financial statement once a year. Mrs. Ponder admitted that the bid also covered the publication of election notices and sample election ballots which typically ran for two weeks. Undisputed evidence, however, shows the Ozark Graphic ran into severe circulation trouble from the very start. Mr. Lipps admitted that within a few months of its first press run the Ozark Graphic's circulation had dropped by half. Plaintiffs do not argue, nor is it reasonable to assume, that this lack of reader interest was in any way related to the absence of county legal notices. Even generously assuming that in absence of the 48 cent bid the Ozark Graphic would have received the county's legal ad business at its original bid of 98 cents,[18] evidence at trial suggested that this would have increased the Ozark Gralphic 's revenues by less than two or three thousand dollars per year--hardly enough to save it.
 
 
 28
 Other theories might more easily explain what forced plaintiffs out of the newspaper business. Plaintiffs themselves admitted in a departing editorial that their hard-hitting approach to controversial local issues was "the underlying cause behind the loss of [a] local financial advertising base of support." Another possibility is that Ripley County simply cannot support two newspapers and two shoppers.[19] This, of course, was the first time in over one hundred years that such a hypothesis was put to a test.
 
 
 29
 We need not determine the exact cause of the Ozark Graphic's demise, however. Nor must plaintiffs systematically eliminate all possible non-predatory causes. Cf. Zenith Radio Corp. v. Hazeltine Research Inc., 395 U.S. 100, 114 n. 9, 89 S.Ct. 1562, 1572 n. 9, 23 L.Ed.2d 129 (1968) (plaintiff claiming unlawful conspiracy under Clayton Act § 4 need prove only some causal injury). Our inquiry in this § 2 Sherman Act case is whether sufficient evidence suggests the price charged to Ripley County for legal advertising was anticompetitive or "exclusionary." To be so, it must have been capable of materially impacting on an equally efficient plaintiff's viability as a market competitor. See Lomar, 824 F.2d at 597; Henry, 809 F.2d at 1344 (only conduct "which permanently eliminates efficient competitors" should be prohibited) (emphasis added); see also Barry Wright, 724 F.2d at 230 (exclusionary conduct is conduct "that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power") (quoting 3 P. Areeda & D. Turner, Antitrust Law p 626) (emphasis added). We conclude that the overwhelming weight of the evidence indicates it was not so capable.III. Conclusion
 
 
 30
 For these reasons, we conclude that the evidence of predatory conduct is insufficient as a matter of law to support the jury's verdict. We therefore reverse the district court's denial of defendants' motion for JNOV, and remand the case for entry of judgment for the defendants.
 
 
 
 [1]
 The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri
 
 
 [2]
 Before that time, the Morgans published a monthly nature-oriented tabloid. This tabloid did not seriously compete with the Prospect-News
 
 
 [3]
 Trial testimony indicated that the $10 sales price was paid merely for use of the newspaper's name. Plaintiffs later sold off some of their equipment for approximately $1000
 
 
 [4]
 Newspaper space is typically computed in column inches. The newspapers published by both parties contained 172 column inches per page
 
 
 [5]
 Although defendants testified that they considered the 48 cent rate legally binding, there is no evidence of any formal contract executed between the county and the defendants. No formal bidding was conducted in later years. Shortly after the 1980 bidding, plaintiffs unilaterally submitted to the county a second bid of 50 cents. Mr. Lipps testified that this was done to keep the Ozark Graphic's "foot in the door" in the event defendants later tried to raise their rate. Plaintiffs' newspaper, however, never received any legal advertising from the county
 
 
 [6]
 Defendants' pre-1980 rates for legal advertising varied according to the type of notice and the entity placing the notice. They charged public entities such as Ripley County a rate of $1.22 per column inch, which the parties claim was the maximum allowed by Missouri law at the time. Defendants charged rates of between $2.00 and $2.50 to individuals ordered by court or required by law to publish notices. Finally, they charged fixed prices for some types of standard notices such as probate settlement and adoption
 
 
 [7]
 This merchant was Clayton Jamison, owner of Jamison's IGA. Jamison admitted, however, that no specific price was discussed during that conversation. Nor did Jamison switch his advertising to the Prospector at that time. He testified that he did not switch his advertising over to the Prospector until July 1982, after most of the other advertisers had already switched over. Shortly after Jamison's switch, plaintiffs ceased publication of the Ozark Shopper
 
 
 [8]
 This witness, Fred Long of Fred's Discount Store, testified he did not typically run printed ads. Rather, he printed his own circulars and inserted them into the Ozark Shopper at a rate of 3.5 to 4.0 cents per copy. The only evidence of the rate Long actually paid the Prospector for a similar arrangement after he switched over was his testimony that he paid "nearly the same price."
 
 
 [9]
 Although Henry was a price discrimination case under the Robinson-Patman Act, we acknowledged there that the same basic principles apply in a case under section 2 of the Sherman Act. See Henry, 809 F.2d at 1345
 
 
 [10]
 Defendants argue that plaintiffs presented no evidence of defendants' share of the relevant market, which they argue should include not only newspaper advertising but also other types of advertising such as direct mail, radio, and regional and national publications. In addition, defendants argue that because entry barriers to starting up a competing newspaper in the area are low, they lack the power to maintain monopoly prices
 Because our holding disposes of the case on the issue of predatory conduct, we need not decide these issues. We do note, however, that at least one of the grocers testified that he perceived newspaper advertising as a more effective way of advertising than radio. Of course, legal advertising can be done only through newspapers. Finally, one cannot ignore the small size of the community and its limited number of advertisers and subscribers as important factors. It would not seem unreasonable to conclude that Ripley County could support, at most, two newspapers. See People's Press, Inc. v. Yazoo Publishing Co., 12 Media L.Rep. (BNA) 1249, 1250 (S.D.Miss.1985) (finding relevant product market in small community to be newspaper advertising and inserts).
 
 
 [11]
 Average variable cost is the sum of all variable costs--those costs that vary with output--divided by output. Average total cost is the sum of all costs, fixed and variable, divided by total output. Average total cost is, by definition, higher than average variable cost at all outputs. See 3 P. Areeda & D. Turner, Antitrust Law p 712 (1978)
 
 
 [12]
 Mr. Mitchell identified only two cost categories as variable: printing and materials. He identified two other costs--labor and postage--as "semivariable." Semivariable costs are those that vary only indirectly with the volume of advertising. As Mr. Mitchell explained, for instance, the mere fact that it takes 10 workers to produce a newspaper typically containing ten pages does not mean that an additional worker is required to produce an 11-page newspaper
 Mr. Mitchell's testimony and documentary support indicate that even when both variable and semivariable costs are considered, the resulting average per column inch ranged from 75 cents in 1981 to 68 cents in 1983. When only the variable costs are considered, the average was only 34 to 38 cents during those years. J.App.Vol. II at 381. Plaintiffs did not produce evidence suggesting alternative variable cost figures.
 
 
 [13]
 Undisputed evidence, in fact, suggests that defendants' price quote to AG Market was competitively based. The $269 price was in line with the price defendants were charging their only two-page merchant advertiser at the time, Whittom's Big Star Market. Mrs. Ponder testified that a $300 price charged to Whittom's included not only a similar two-page ad, but also weekly printing of handbills. Further, plaintiffs admitted that the public's only knowledge of what the Ozark Shopper was charging AG Market before the switch came from its rate sheet indicating a rate of $307. Defendants claim that their quote to AG Market was designed to beat that price. Plaintiffs produced no evidence whatsoever to rebut this evidence
 
 
 [14]
 Chester Ponder testified that at the 48 cent rate, a full page of legal advertising would produce a revenue of $82.56, whereas the per page printing cost was $34.56. He added that there was very little layout or composition involved since the notices were pre-printed, and because the ads often ran for two consecutive weeks, requiring no additional layout in the second week. Mr. Mitchell agreed that the Prospect-News' per page printing costs were lower than those of the Prospector
 
 
 [15]
 The figures Mr. Mitchell submitted indicate that the 48 cent rate would still have been above the aggregate of those costs he labeled as strictly "variable." However, it appears to fall below the sum of the variable costs and "semivariable" costs
 
 
 [16]
 Although plaintiffs produced evidence suggesting that defendants reduced prices on other types of legal advertising, they have focused their case on the 48 cent county ad rate. They cite no evidence suggesting that the estate settlement notices rate, or any other legal ad rate, was below average variable cost
 
 
 [17]
 We appreciate the difficulty that plaintiffs face in attempting to isolate variable costs that are uniquely incurred to produce the product alleged to have been predatorily priced. See Marsann, 788 F.2d at 615-16 (Choy, J., concurring). This case, however, is unlike Marsann in that it does not involve merely a portion of output of a single, undifferentiated good. See id. at 614 n. 2. Rather, uncontested evidence indicates not only that legal advertising is distinct from and less costly to produce than items such as news reporting, but that it is also distinct from other types of advertising
 Professors Areeda and Turner suggest that where it is difficult to isolate variable costs of particular products due to "joint costs" attributable to more than one product (sales, labor, administrative expenses, machinery) the plaintiff should be required to prove across-the-board predatory pricing. See 3 P. Areeda & D. Turner, Antitrust Law p 719. "Where virtually all costs are joint, predation can be tested only by comparing the combined prices of the several products with their aggregate marginal costs." Id. (emphasis added).
 Here, plaintiffs seek the best of both worlds. They single out a particular item--Ripley County legal advertising--as allegedly priced below cost. Yet, they attempt to rely on inferences which, at most, would establish the variable cost of operations as a whole. Plaintiffs should be required to show that defendants' prices as a whole are below cost, or they should be required to isolate the variable (or incremental) costs attributable to Ripley County's legal ads and show that below-cost pricing of these legal ads had a significant anticompetitive effect. Plaintiffs have made neither of these showings.
 
 
 [18]
 The nature of a bidding process for a single customer, of course, is "winner-take-all." This at least was the assumption upon which both parties submitted bids. It seems quite speculative to hypothesize as to which party would have won the bidding at what price had no alleged predation occurred. On the other hand, a predator should not be entitled to benefit from such an uncertainty. Our assumption that the plaintiffs would have received the county business at its 98 cent bid is justified on this ground
 
 
 [19]
 Plaintiffs' counsel, at oral argument, acknowledged the possibility that Ripley County could support only one newspaper