PRESTRESSED CONCRETE,
INC., Appellant,

v.

BLADHOLM BROS. CULVERT COMPA-
NY, The Cretex Companies, Inc., et al.,
North Star Concrete Company, Respon-
dents,

John Doe, et al., Defendants.

No. C6–92–1725.

Court of Appeals of Minnesota.

April 6, 1993.

Review Denied May 28, 1993.

Daniel R. Shulman, Terry M. Walcott,
Gray, Plant, Mooty, Mooty & Bennett,
P.A., Minneapolis, for Prestressed Con-
crete, Inc.

David Bradley Olsen, Stuart T. Williams, Henson & Efron, P.A., Minneapolis, for Bladholm Bros. Culvert Co.

Peter S. Hendrixson, Carol A. Peterson, Dorsey & Whitney, Minneapolis, for The Cretex Companies, Inc., et al.,

Jerome B. Pederson, Sue Halverson, Fredrikson & Byron, P.A., Minneapolis, for North Star Concrete Co.

Considered and decided by KLAPHAKE, P.J., and HARTEN and STONE,* JJ.

## OPINION

BRUCE C. STONE, Judge.

Appellant Prestressed Concrete, Inc. (PCI) sued respondents Bladholm Bros. Culvert Co. (Bladholm), Cretex Companies, Inc. and its subdivision Elk River Concrete Co. (Elk River), and North Star Concrete Co. (North Star), claiming they conspired to monopolize the reinforced concrete pipe market in Minnesota. PCI also alleged Elk River and Bladholm conspired to monopolize the Minnesota bridge girder market. The district court granted respondents summary judgment and this appeal followed.

## FACTS

PCI and Elk River were long-time manufacturers of prestressed concrete bridge girders in Minnesota. In 1981, Elk River had about 70% and PCI had about 20% of the market share. In 1981, Bladholm, which had been engaged primarily in the concrete pipe business, began producing bridge girders in Minnesota. Bridge girders are generally used by the State of Minnesota or its political subdivisions for large construction projects. PCI alleges that from at least the fall of 1982 to May 1985, Elk River and Bladholm conspired to monopolize the bridge girder market in Minnesota, to force PCI out of business, and to ensure that they (Elk River and Bladholm) would be the only two surviving sellers of bridge girders.

Elk River, Bladholm, and North Star have manufactured reinforced concrete pipe in Minnesota for many years. In 1981, North Star had a market share of about 40%, Elk River had a share of about 40%, and Bladholm had a 10% share of the market. In 1982, PCI ordered a pipe-making machine and entered the Minnesota pipe market. Once it entered the pipe market, PCI claims respondents conspired to discount their bids to contractors to prevent PCI from receiving a contract. Before PCI's entry into the pipe market, respondents had identical list prices from which they discounted up to 10% for particular consumers. After PCI's entry into the market, some of respondent's discounts, according to PCI, were 30% or more, making the discounted prices below both average total cost and average variable cost. This price cutting occurred primarily in the metropolitan area, where PCI concentrated its business.

Ultimately, PCI filed chapter 11 bankruptcy in August 1984, ceased operations altogether in May 1985. In 1985, Bladholm bought PCI's assets and proceeded to scrap PCI's bridge business and sell certain pipe assets to North Star and Elk River. In 1990, Bladholm sold its pipe business to Royal, Inc.

In February 1987, PCI sued respondents on four antitrust claims alleging both conspiracies and attempts, and both concrete pipes and bridge girder violations. It alleged (1) Bladholm, Elk River, and North Star conspired to monopolize or reduce competition in concrete pipe in violation of Minn.Stat. § 325D.51 (1990) (restraint of trade); (2) Elk River and North Star attempted to monopolize the concrete pipe market in violation of Minn.Stat. § 325D.52 (1990) (establish, maintain or use monopoly power); (3) Elk River attempted to monopolize the bridge girder market in violation of Minn.Stat. § 325D.52; and (4) Elk River and Bladholm, as well as other corporations and individuals, conspired to monopolize the bridge girder market in violation of Minn.Stat. §§ 325D.51, .52, and .53.

---

* Retired judge of the district court, serving as judge of the Minnesota Court of Appeals by appointment pursuant to Minn. Const. art. VI, § 10.

After five years of discovery, respondents moved for summary judgment on all counts in March 1992, and the district court granted summary judgment. It acknowledged that the question of what constitutes predatory pricing under the Minnesota Antitrust Law of 1971 is one of first impression. The district court ruled that proof of predatory pricing is necessary to prove antitrust injury, and that PCI failed to provide sufficient evidence to create disputed facts so as to preclude summary judgment. In the alternative, the district court ruled PCI must also prove respondents had a reasonable expectation of recouping any of their losses due to predatory pricing. This appeal followed.

### ISSUES

I. Is conspiracy to monopolize a cause of action under the Minnesota Antitrust Law of 1971?

II. Did the district court err by resolving genuine issues of material fact whether respondents engaged in predatory pricing?

III. Did the district court err by resolving genuine issues of material fact whether respondents had a reasonable expectation of recouping their losses?

### ANALYSIS

#### *Standard of Review*

On appeal from a summary judgment, the reviewing court must determine (1) whether there are genuine issues of material fact, and (2) whether the district court erred in its application of the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). The district court may not decide factual issues; its sole function is to determine whether fact issues exist. *Nord v. Herreid*, 305 N.W.2d 337, 339 (Minn. 1981). When opposing a summary judgment motion, an antitrust plaintiff must present evidence that tends, when interpreted in a light most favorable to plaintiff, to exclude the possibility that defendants' conduct was as consistent with permissible competition as with illegal conduct. *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### I.

▮ The first issue is whether the Minnesota Antitrust Law of 1971 provides a cause of action for conspiracy to monopolize. We hold that it does, and in so doing rely on federal case law developed under the Sherman Act for support. *See State by Humphrey v. Road Constructors, Inc.*, 474 N.W.2d 224, 225 n. 1 (Minn.App.1991) (Minnesota antitrust law is interpreted consistent with federal construction of the Sherman Act), *pet. for rev. denied* (Minn. Oct. 31, 1991). Two statutes are important to our holding. First, Minn.Stat. § 325D.51 (1990) provides that a "contract, combination, or *conspiracy* between two or more persons in unreasonable restraint of trade * * * is unlawful." (Emphasis added). Second, Minn.Stat. § 325D.52 (1990) provides:

> The establishment, maintenance, or use of, or any attempt to establish, maintain, or use monopoly power over any part of trade or commerce by any person or persons for the purpose of affecting competition or controlling, fixing, or maintaining prices is unlawful.

Significantly, neither of these sections expressly prohibits a conspiracy to monopolize: section 325D.51 prohibits a conspiracy in restraint of trade, and section 325D.52 prohibits an attempt to monopolize. In contrast, section 2 the Sherman Act, which provided the model for section 325D.52, expressly outlaws conspiracies to monopolize. 15 U.S.C.A. § 2 (West.Supp.1992). Section 325D.51 of the Minnesota act, however, is modelled on section 1 of the Sherman Act. *Compare* Minn.Stat. § 325D.51 *with* 15 U.S.C.A. § 1 (West Supp.1992). Conspiracy to monopolize under section 2 of the Sherman Act necessarily amounts to an unreasonable restraint of trade under section 1. *Alexander v. National Farmers Org.*, 687 F.2d 1173, 1183 (8th Cir.1982), *cert. denied*, 461 U.S. 937–39, 103 S.Ct. 2108–10, 77 L.Ed.2d 313–14 (1983). Therefore, we hold Minn.Stat § 325D.51 implicit-

ly provides a cause of action in Minnesota for conspiracy to monopolize.

## II.

■ The elements of conspiracy to monopolize are (1) a concerted action, (2) specific intent to achieve an unlawful monopoly, and (3) commission of an overt act in furtherance of the conspiracy. *Advance Health–Care Serv., Inc. v. Radford Community Hosp.*, 910 F.2d 139, 150 (4th Cir. 1990). In this case, PCI claims Elk River engaged in predatory pricing and bid rigging, which amounted to overt acts in furtherance of the conspiracy to exclude competition in Minnesota's bridge girder market. In the concrete pipe market, PCI alleges Elk River, Bladholm and North Star employed predatory pricing and bid rigging, which also amounted to a conspiracy to monopolize.

The requirements to establish a conspiracy are well set forth in *American Tobacco Co. v. United States*, 328 U.S. 781, 809–10, 66 S.Ct. 1125, 1139, 90 L.Ed. 1575 (1946):

No formal agreement is necessary to constitute an unlawful conspiracy. Often crimes are a matter of inference deduced from the acts of the person accused and done in pursuance of a criminal purpose. Where the conspiracy is proved, as here, from the evidence of the action taken in concert by the parties to it, it is all the more convincing proof of an intent to exercise the power of exclusion acquired through that conspiracy. The essential combination or conspiracy in violation of the Sherman Act may be found in a course of dealings or other circumstances as well as in any exchange of words.

The district court concluded PCI failed to raise genuine issues of material fact about whether respondents engaged in predatory pricing or bid rigging in either the pipe or bridge market. We disagree, reverse the district court's grant of summary judgment, and remand to the district court for trial.

■ To prove predatory pricing, PCI must show either (1) defendants' prices as a whole are below cost, or (2) isolate the variable costs [1] attributable to the product and show that below-cost pricing had a significant anticompetitive effect. *Morgan v. Ponder*, 892 F.2d 1355, 1362–63 n. 17 (8th Cir.1989). In addition, PCI must show respondents had a reasonable expectation of recouping any losses from predatory pricing. *See Matsushita*, 475 U.S. at 588–89, 106 S.Ct. at 1357 ("the conspirators must have a reasonable expectation of recovering, in the form of later monopoly profits, more than the losses suffered"); *see also A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1403 (7th Cir.1989) (predatory pricing must involve, along with below cost pricing, the rational expectation of later realizing monopoly profits), *cert. denied*, 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990).

■ PCI raised genuine issues of material fact whether Elk River had priced its pipe below cost. Norbert Soukup, PCI's former CEO, submitted a set of calculations in which he analyzed on a job-by-job basis the prices that Elk River charged for its pipe. According to Soukup's calculations, Elk River sold its pipe below average cost on 19 pipe jobs.[2] PCI lost the bid on

---

1. *Morgan v. Ponder*, 892 F.2d 1355 (8th Cir. 1989), provides useful definitions:

Average variable cost is the sum of all variable costs—those costs that vary with output—divided by output. Average total cost is the sum of all costs, fixed and variable, divided by total output. Average total cost is, by definition, higher than average variable costs at all outputs.

*Id.* at 1360 n. 11 (citing Philip Areeda & Donald Turner, III *Antitrust Law* § 712 (1978)).

2. The 19 jobs identified by Soukup involve the following customers, cost, discounted selling

price (based on Soukup's calculations), and letting date:

1. Barbarossa in Ramsey County: $394,212.34, $341,434.24 (April 25, 1984);
2. Barbarossa in Maple Grove: $132,587.96, $114,400.65 (June 1, 1984);
3. Northdale in Maple Grove: $79,376.02, $67,610.14 (June 15, 1984);
4. Barbarossa in Eden Prairie: $79,530.52, $75,182.78 (June 22, 1984);
5. Forest Lake in Andover: $14,403.02, $12,033.50 (June 26, 1984);
6. Keller in White Bear Lake: $12,770.00, $11,694.99 (August 10, 1984);

each of these projects. Based on *Morgan,* we conclude PCI provided sufficient evidence of predatory pricing as an overt act of conspiring to monopolize, to preclude summary judgment.

Respondents challenge the accuracy of Soukup's method for identifying variable costs. This raises a genuine issue of material fact. *See Kelco Disposal, Inc. v. Browning–Ferris Indus. of Vt., Inc.,* 845 F.2d 404, 407 (2d Cir.1988) (character of costs is a "battleground" because the higher a party's average variable cost, the more likely the party priced below that cost), *aff'd,* 492 U.S. 257, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989). The district court, however, improperly determined the credibility of Soukup's calculations and the weight to give to the evidence. *See Nord,* 305 N.W.2d at 339 (on summary judgment, the district court is not to decide factual issues). Accordingly, because there is a "legitimate dispute" about PCI's characterization of Elk River's fixed and variable costs, we conclude the issue should be resolved by the factfinder. *See U.S. Philips Corp. v. Windmere·Corp.,* 861 F.2d 695, 704 (Fed.Cir.1988) (characterization of disputed costs is a question of fact for the jury), *cert. denied,* 490 U.S. 1068, 109 S.Ct. 2070, 104 L.Ed.2d 635 (1989).

■ Similarly, PCI has raised a genuine issue of material fact whether Elk River and Bladholm engaged in predatory pricing in the bridge market. Specifically, PCI's expert, Dewayne Scheer, a certified public account, alleged: based on Elk River's financial accounts, Elk River lost money in 1984, 1985, and 1986 in its concrete bridge business; and based on Bladholm's financial statements, Bladholm lost money in 1985 and 1986 in its concrete bridge business. PCI's showing that both Elk River and Bladholm lost money in their bridge businesses indicates their prices as a whole were below total cost. Hence, based on *Morgan,* PCI raised a genuine issue of material fact regarding whether Elk River and Bladholm engaged in predatory pricing.

In addition to identifying predatory pricing, PCI must also show respondents' predatory pricing had a significant anticompetitive effect. *Morgan,* 892 F.2d at 1362–63 n. 17. At least on the surface, and for purposes of summary judgment, PCI's bankruptcy provides sufficient evidence to raise a genuine issue of material fact whether respondents' alleged conspiracy to monopolize had an anticompetitive effect on either or both the bridge and pipe markets.

■ It is well established that an antitrust plaintiff, like PCI, is not required to show that each respondent participated in each act of predatory pricing; instead, once the conspiracy is established, each conspirator is liable for the acts of any co-conspirator performed in furtherance of the conspiracy. *Esco Corp. v. United States,* 340 F.2d 1000, 1006–08 (9th Cir.1965). Accordingly, PCI need not show that Elk River, Bladholm and North Star each engaged in predatory pricing. It is enough to show that Elk River was involved in below-cost pricing. Hence the trial court also erred by granting summary judgment to Bladholm and North Star.

### III.

Finally, the district court erred by concluding no genuine issues of material fact

7. Barbarossa in ·Maple Grove: $12,656.20, $11,481.47 (August 17, 1984);
8. Robinson Construction in Wayzata: $146,425.44, $127,943.97 (August 21, 1984);
9. Thomas & Sons in Anoka: $49,352.28, $41,668.16 (August 27, 1984);
10. Keller in St. Paul: $265,187.90, $214,296.88 (September 5, 1984);
11. Arcon in Ramsey County: $36,469.24, $32,245.20 (September 5, 1984);
12. Northdale Construction in Eden Prairie: $79,303.92, $62,476.60 (October 11, 1984);
13. Total Asphalt Construction in Eden Prairie: $4,448.90, $4011.24 (October 11, 1984);

14. Shafer in Ramsey County: $23,458.86, $20,100.31 (November 7, 1984);
15. Barbarossa in Maple Grove: $45,799.76, $39,841.34 (February 1, 1985);
16. Johnson Brothers in St. Paul: $169,577.80, $128,225.41 (March 8, 1985);
17. Total Asphalt in St. Paul: $2,505.63, $2,191.95 (March 27, 1985);
18. Barbarossa in Coon Rapids: $16,625.88, $13,846.58 (April 5, 1985);
19. Widmer Brothers in Maple Grove: $7,169.42, $6,874.96 (April 12, 1985).

existed about whether respondents had a reasonable opportunity to recoup lost profits. *See Matsushita,* 475 U.S. at 588–89, 106 S.Ct. at 1357. Soukup testified that substantial investment was needed to enter the pipe market. Richard Hoyt, PCI's expert economist, testified the pipe and bridge markets were controlled by four or fewer firms. Hoyt also alleged high plant and capital costs, well-entrenched firms, collusive behavior (including price fixing and bid rigging), and geographic market divisions created high barriers to entry into the pipe and girder markets. Viewed in the light most favorable to PCI, this evidence raises genuine issues of material fact whether respondents had a reasonable expectation of recouping profits from their alleged predatory pricing.

In sum, we hold the district court erred by granting summary judgment to respondents on PCI's conspiracy and attempts to monopolize claims: genuine issues of material fact exist whether Elk River, Bladholm and North Star agreed to and engaged in predatory pricing, whether their predatory pricing had an anticompetitive effect, and whether respondents had a reasonable opportunity to recoup their lost profits. We reverse and remand for trial.

## DECISION

The trial court erred by granting respondents summary judgment on appellant's conspiracy and attempt to monopolize claims.

Reversed and remanded.