991 F.2d 1389
 61 USLW 2690, 1993-1 Trade Cases P 70,190
 INTERNATIONAL TRAVEL ARRANGERS, a corporation, Plaintiff-Appellee,
v.
NWA, INC.; Northwest Airlines, Inc.; Republic Airlines,
Inc.; Mainline Travel, Inc., Defendants-Appellants.
INTERNATIONAL TRAVEL ARRANGERS, a corporation, Plaintiff-Appellant,
v.
NWA, INC.; Northwest Airlines, Inc.; Republic Airlines,
Inc.; Mainline Travel, Inc., Defendants-Appellees.
 Nos. 92-1037, 92-1039.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 11, 1992.
Decided April 16, 1993.
Rehearing and Rehearing En Banc
Denied May 26, 1993.
 
 Donald L. Flexner, Washington, DC, argued (Clifton S. Elgarten, Luther Zeigler and David F. Williams, Washington, DC, Paul B. Klaas, Michael A. Lindsay and Scott A. Benson, Minneapolis, MN, on the briefs), for defendants-appellants.
 Harold J. Tomin, Los Angeles, CA, argued (Michael R. Cunningham, David M. Coyne and Gina B. Sauer, Minneapolis, MN, on the briefs), for plaintiff-appellee.
 Before McMILLIAN, Circuit Judge, FRIEDMAN,* Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 FRIEDMAN, Senior Circuit Judge.
 
 
 1
 This appeal and cross-appeal grow out of consolidated suits by a wholesale tour operator against an airline and its affiliated companies charging that they (1) violated sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2 (1988), and section 7 of the Clayton Act, 15 U.S.C. § 18 (1988), and (2) breached their contractual and other obligations toward, and defrauded, the plaintiff. The alleged violations related to the dealings between the airline and the tour operator involving chartered aircraft and aircraft seats the airline provided to the tour operator.
 
 
 2
 After the district court granted summary judgment dismissing some of the claims, the balance of the case was tried to a jury. The jury found for the defendants on all but two of the claims. The jury ruled for the plaintiff on its claims that the defendants (1) had monopolized and attempted to monopolize through predatory pricing and (2) had fraudulently made a promise to the tour operator that they did not perform, and the jury awarded damages on those claims.
 
 
 3
 Each side has appealed from the portions of the judgment against it. We reverse the portions of the judgment in favor of the plaintiff, and affirm the remainder of the judgment.
 
 I.
 
 4
 The appellee and cross-appellant, International Travel Arrangers (International), operates air tours out of and sells airline seats for travel from Minneapolis-St. Paul (Minneapolis) to various places in the United States. International is the second largest firm in that business in Minneapolis. International either charters aircraft or purchases blocks of seats from air carriers. It then either incorporates these seats in package tours (which also include hotel accommodations, food, etc.) that it sells, or sells the seats separately. Those sales are made largely through travel agents.
 
 
 5
 The appellants and cross-appellees are: Northwest Airlines, Inc., an airline that is a major carrier serving Minneapolis; NWA, Inc., its parent holding company; Republic Airlines, Inc. (Republic), an air carrier; and Mainline Travel, Inc. (Mainline), a tour operator. Mainline is the largest tour operator in Minneapolis.
 
 
 6
 Prior to 1985, Mainline and Republic were independent entities. In 1985, NWA acquired Mainline after obtaining from the Department of Transportation an exemption from the requirement in the Federal Aviation Act that such an acquisition receive formal approval by the Department. In granting the exemption, the Department "concluded that the acquisition was 'not likely to have anticompetitive effects or to be otherwise inconsistent with the public interest.' Application of NWA, Inc., DOT Order 85-7-70 at 3 (July 30, 1985). The DOT noted, however, that 'NWA has not requested, and will not receive, antitrust immunity for this transaction. The antitrust laws will, therefore, remain available as a remedy if NWA's acquisition later presents a threat to competition.' Id." International Travel Arrangers v. NWA, Inc., 723 F.Supp. 141, 144 (D.Minn.1989).
 
 
 7
 The next year, NWA acquired Republic, following the Department's formal approval of that acquisition in a contested proceeding. Id. In granting approval, the Department did not provide antitrust immunity, as it could have done under the governing statute.
 
 
 8
 International's supplemental complaint contained seven claims. Claims one and two alleged that NWA's acquisitions of Mainline and Republic violated section 7 of the Clayton Act. Claim three alleged that the defendants had combined and conspired to restrain and monopolize trade, in violation of sections 1 and 2 of the Sherman Act and had monopolized and attempted to monopolize trade, in violation of section 2 of that Act. Claims 4 through 7 asserted state law claims: "[t]ortious breach of the duty of good faith and fair dealing" (claim four), "fraud" (claim five), "breach of contract" (claim six), and "interference with contractual relations and prospective economic advantage" (claim seven).
 
 
 9
 On cross-motions for summary judgment, the district court** denied International's motion and granted Northwest's motion with respect to two of the claims. The court denied Northwest's motion with respect to the five other claims, holding that there were disputed issues of material fact regarding those claims. Id. at 141.
 
 
 10
 The court held that International's Clayton Act challenge to NWA's acquisition of Republic was barred by the Department of Transportation's approval of the acquisition. Id. at 146-48. Noting that the exclusive forum for review of such determinations was the Court of Appeals for the District of Columbia Circuit, the district court ruled that the Department's decision upholding the merger must be given "finality," id. at 148, but that International retained the right "to challenge [under the antitrust laws] post-merger anticompetitive conduct." Id. at 147-48.
 
 
 11
 The court also dismissed the fourth claim, holding that under the "relevant [Minnesota] case law," International "has no independent cause of action for breach of the duty of good faith and fair dealing." Id. at 153.
 
 
 12
 The remainder of the case was then tried to a jury. The commerce involved in International's antitrust claim was air transportation between Minneapolis and eleven cities in the United States and abroad. As the case developed at trial, however, the focus was on transportation between Minneapolis and seven cities in the United States.
 
 
 13
 International contended, among other things, that Northwest had monopolized and attempted to monopolize air transportation between those cities in the summer of 1988 by predatory pricing. In support of this theory--the only antitrust claim on which International prevailed before the jury (see below)--International introduced evidence purporting to show that Northwest had sold seats for such transportation below cost.
 
 
 14
 International also contended that Northwest had defrauded it and breached contractual commitments with respect to supplying air transportation to it in the winter of 1986. International introduced evidence intended to show that prior to its acquisition of Mainline, Northwest had undertaken to treat International as favorably as it would treat Mainline with respect to both chartering of aircraft and supplying of seats on scheduled flights, but that Northwest had failed to do so.
 
 
 15
 In a special verdict, the jury found that before Northwest's acquisition of Mainline, the defendants had not conspired or combined to restrain trade, that before or during 1986, Northwest did not possess monopoly power in any relevant market and did not acquire or maintain such power through anticompetitive acts, had no specific intent to acquire monopoly power or had not engaged in anticompetitive conduct to obtain such power, and that the defendant had not conspired to gain monopoly power.
 
 
 16
 The jury also rejected International's claims (1) that NWA's acquisition of Mainline violated section 7 of the Clayton Act, the jury finding that the acquisition had not substantially lessened competition or tended to create a monopoly, and (2) that Northwest had breached a contract with International or interfered with International's contractual relationships.
 
 
 17
 The jury found, however, that in the 1988 summer season, Northwest had monopolized and attempted to monopolize trade, and awarded International damages of $235,000 for that violation, which the district court trebled. The jury also upheld International's fraud claim, finding that Northwest knowingly had made false representations to International, upon which it intended International to act, and that International justifiably relied upon those misrepresentations. The jury awarded International damages of $850,000 and punitive damages of another $850,000 on the fraud claim.
 
 
 18
 The court entered judgment for International for $2,408,000, costs and a reasonable attorney's fee. It denied Northwest's motions for judgment n.o.v. and for a new trial and International's motion for a new trial.
 
 
 19
 International sought under section 4 of the Clayton Act $2,885,607 for attorney's fees and costs and expenses on its antitrust claim. The district court awarded $125,000, noting that "[t]he overall relief obtained by the plaintiff was relatively small compared to the number of hours expended on the litigation."
 
 II. The Antitrust Claims
 
 20
 A. Northwest's Appeal: The Predatory Pricing Claim
 
 
 21
 The jury's finding that Northwest monopolized and attempted to monopolize for the 1988 summer season was based upon International's contention that in that period Northwest engaged in predatory pricing by selling seats for less than its cost of providing the transportation. "Predatory pricing may be defined as pricing below an appropriate measure of cost for the purpose of eliminating competitors in the short run and reducing competition in the long run." Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 117, 107 S.Ct. 484, 493, 93 L.Ed.2d 427 (1986) (footnote omitted). Northwest contends that the jury verdict awarding $235,000 for Northwest's monopolization and attempted monopolization in the summer of 1988 cannot stand because "[t]he evidence [International] relied upon in support of this claim was flatly inconsistent with the requirements for proof of a predatory pricing claim set forth in Morgan v. Ponder, 892 F.2d 1355 (8th Cir.1989)."
 
 
 22
 1. In Morgan, this court approved application of the principles we had formulated in Henry v. Chloride, Inc., 809 F.2d 1334 (8th Cir.1987) (governing predatory pricing under the price discrimination provisions of the Robinson Patman Act), to a claim of predatory pricing as a basis for determining monopolization and attempted monopolization under section 2 of the Sherman Act. We stated that "[a]s we indicated in Henry, objective cost analysis is the crucial component in a prima facie case of predatory pricing." 892 F.2d at 1360 (citation omitted).
 
 
 23
 We explained that "[a]verage variable cost is the sum of all variable costs--those costs that vary with output--divided by output. Average total cost is the sum of all costs, fixed and variable, divided by total output. Average total cost is, by definition, higher than average variable cost at all outputs." Id. n. 11. The court specified "cost markers" for determining "whether a price is predatory":
 
 
 24
 1. "[P]rices above average total cost are legal per se."
 
 
 25
 2. "At prices above average variable cost the plaintiff must overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive."
 
 
 26
 3. "At prices below average variable cost, the burden of showing non-predation falls on the defendant."
 
 
 27
 Id. at 1360.
 
 
 28
 The district court's charge to the jury on predatory pricing was based upon and reflected these principles. The court told the jury in instruction 43:
 
 
 29
 In order to prevail on its predatory pricing claim, [International] has the burden of proving that defendants' overall pricing structure in the relevant markets is below some appropriate measure of cost. Prices above average total cost are legal per se. If you find that defendants' prices in the relevant markets were above average total cost, then you must rule for the defendants on [International's] claim, without regard to any other evidence of alleged predatory conduct. "Average total cost" is the sum of all costs, fixed and variable, divided by total output. Prices below average total cost but above average variable cost are presumptively legal. If you find that defendants priced below average total cost but above average variable cost in the relevant markets, [International] must overcome a strong presumption of legality by showing other factors indicating that the price charged was anticompetitive--that is, that defendants were acting predatorily. "Average variable cost" is the sum of all variable costs--those costs that vary with output--divided by output.
 
 
 30
 The court in Morgan referred to "the futility in attempting to discern predatory conduct solely through evidence of a defendant's 'predatory intent.' " Id. at 1359. It also pointed out that evidence of "price cuts and lower profits followed by higher prices and higher profits once the competition is gone," is "no less ambiguous and misleading than the evidence of so-called 'predatory intent.' " Id. The court stated that "[t]he difficulty, of course, is distinguishing highly competitive pricing from predatory pricing. A firm that cuts its prices or substantially reduces its profit margin is not necessarily engaging in predatory pricing. It may simply be responding to new competition, or to a downturn in market demand. Indeed, there is a real danger in mislabeling such practices as predatory, because consumers generally benefit from the low prices resulting from aggressive price competition." Id. at 1358-59.
 
 
 31
 Although International contends that much of the discussion in Morgan is dicta, we do not so view it. To the contrary, we stated there the principles this court applies in determining if selling below cost constitutes predatory pricing, to ascertain whether monopoly power has been willfully acquired or maintained in violation of section 2 of the Sherman Act.
 
 
 32
 The question before us, therefore, is whether, under these principles and "viewing [the] evidence in the light most favorable to [International] ... the jury could reasonably have inferred" that Northwest engaged in predatory pricing. Henry, 809 F.2d at 1347.
 
 
 33
 2. In support of its claim of predatory pricing, International relied primarily upon a study of Mainline's costs and prices made by Charles Wiese, a certified public accountant who is experienced in cost accounting and cost allocation. In his study, which was admitted into evidence, Wiese first determined, with respect to Mainline's operations between Minneapolis and seven cities in the United States, the direct and indirect costs of providing the transportation. In determining direct costs for charters, he used the amount Mainline paid for the charters, but for individual seats, he used Northwest's costs, because the price Northwest charged Mainline was "a price that's between related entities, which in the normal sense of accounting for cost and determining an enterprise's profitability ... we tend to eliminate the activities between the companies."
 
 
 34
 Based on these figures, Wiese calculated Mainline's "average total cost for putting airplanes in the sky," its "[a]verage total cost per seat sold." He then compared certain of Mainline's actual fares on those routes to Mainline's "average total cost" of the seats. "These comparisons showed that Mainline's price for the seats were, in varying amounts, below its average total cost of those seats." His study addressed only "average total costs for available seats" and did not consider Mainline's "average variable cost" for those seats.
 
 
 35
 On cross-examination, Wiese admitted that he only considered those Mainline fares that would support a conclusion that Mainline sold below cost; with respect to four cities, he did not consider Mainline's higher fares because "[m]y assignment was to compare the fares that [Mainline] was charging for a particular city pair to the total direct cost and present the fares where the total direct cost was greater than a particular price." He further admitted that the higher fares he failed to consider exceeded Mainline's average total cost. For those four cities, he did not examine Mainline's "overall price structure" or its "overall revenues that it earned on each of these summer 1988 programs."
 
 
 36
 The evidence also showed the percentage of its seats that Mainline sold at the higher fares on two of the four routes, which exceeded Mainline's average total cost. For Los Angeles, 68 percent of the seats were sold at the higher price in July 1988 and 72 percent in August 1988. For Orlando, Florida, the figures for July and August were 57 percent and 58 percent, respectively. Wiese conceded that in providing seats to Mainline at the lower prices, the "seats might have been going out empty, and Northwest made a decision to put a low bulk fare passenger on the aircraft instead of allowing the seat to go empty and getting no revenue from an empty seat."
 
 
 37
 3. Under Morgan, this evidence does not support the jury's verdict that Northwest engaged in predatory pricing in the summer of 1988. Wiese's failure to consider or analyze the substantial number of seats that Mainline sold at prices higher than those that Wiese concluded were below Mainline's average total costs seriously undermined the validity of his conclusion that sales were below cost. Even if some of Mainline's fares were below cost, International has failed to establish, as Morgan requires, that "defendants' overall price structure was predatory." 892 F.2d at 1361. To evaluate Mainline's pricing structure fairly, it was necessary to consider not just its lowest prices, but all of its prices for the routes involved, for that is the only basis upon which the relationship between Mainline's charges and costs could be determined. Wiese did not make that comparison, however, because he was instructed only to "present the fares where the total direct cost was greater than a particular price."
 
 
 38
 Moreover, since Wiese's study only compared Mainline's prices to its average total cost, which necessarily was above its variable cost, see id. at 1360 n. 11, International was required to "overcome a strong presumption of legality by showing other factors indicating that the price charged is anticompetitive." Id. at 1360. International did not make that showing.
 
 
 39
 International relies primarily upon two categories of evidence. First, it cites various items of evidence that it asserts show Mainline's anticompetitive intent. It particularly relies upon the statement by Mr. Neer, Mainline's president, that Mainline cut its prices on its charter to Anchorage, Alaska in the summer of 1988 as a signal to "[s]tay out of my market." In Morgan, this court recognized the weakness of such statements "in attempting to discover predatory conduct," because "[t]hey provide no help in deciding whether a defendant has crossed the elusive line separating aggressive competition from unfair competition. Thus, as our cases have made clear, evidence of statements such as these will not relieve a plaintiff of the burden of proving predation through a separate showing of predatory conduct." Id. at 1359.
 
 
 40
 Second, International points out that after it had withdrawn from Anchorage, Mainline cancelled its lower fares to that city. Morgan also rejected as evidence of predatory intent "what plaintiffs consider the typical pattern of a predatory pricing scheme: price cuts and lower profits followed by higher prices and higher profits once the competition is gone." Id. We stated that "the evidence of defendants' pattern of profits and prices [is] no less ambiguous and misleading than the evidence of so-called 'predatory intent.' " Id.
 
 
 41
 International also cites other evidence allegedly showing Mainline's anticompetitive conduct. Without discussing that evidence, it suffices to say that we conclude that it, too, is insufficient to sustain the jury verdict that Northwest monopolized or attempted to monopolize in the summer of 1988.
 
 
 42
 We recognize that the principle announced in Morgan--that "objective cost analysis is the crucial component in a prima facie case of predatory pricing," id. at 1360,--and the standards we outlined there for determining whether a price is predatory, may make it extremely difficult for plaintiffs to prove predatory pricing in antitrust cases. That difficulty, however, reflects the economic reality "that predatory pricing schemes are rarely tried, and even more rarely successful." Matsushita Elec. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 589, 106 S.Ct. 1348, 1357, 89 L.Ed.2d 538 (1986).
 
 B. International's Cross Appeal
 
 43
 In its cross-appeal from the jury's rejection of its other antitrust claims, International does not challenge the sufficiency of the evidence to support that action. It contends, however, that three of the district court's instructions to the jury were erroneous because they incorporated incorrect legal standards, and that the errors require a reversal of those portions of the judgment and a remand for a new trial on those issues under the correct legal standards. Furthermore, International argues that the jury should have been instructed that the acquisitions by NWA of Mainline and Republic, even if themselves legal, may have been steps in acquiring illegal monopoly power. International also contends that the district court erroneously excluded three of its exhibits and improperly limited the direct and cross-examination of two of its expert witnesses with respect to one of the excluded exhibits.
 
 
 44
 1. Instructions 28 and 29. Although International does not directly challenge the jury's finding that Northwest's acquisition of Mainline did not violate section 7 of the Clayton Act, it attacks two of the district court's instructions relating to that acquisition. It contends that instructions 28 and 29 improperly prevented the jury from considering the acquisition insofar as it constituted an element of International's conspiracy claim under section 1 of the Sherman Act.
 
 
 45
 In instruction 28 the court told the jury that because
 
 
 46
 [c]orporations that are part of the same corporate family ... are not separate entities for purposes of the antitrust laws, they cannot enter into an illegal conspiracy. [International] has alleged in this case that defendants Northwest Airlines and [Mainline] conspired to harm [International] in violation of Section 1 of the Sherman Act. In assessing this claim, you are instructed that Section 1 only applies to the defendants' conduct before Northwest acquired [Mainline].
 
 Instruction 29 stated:
 
 47
 Section 1 of the Sherman Act prohibits only those unreasonable restraints of trade which are affected by a contract, combination or conspiracy between separate entities. The economic substance of the relationship between two entities determines whether they are "separate" for purposes of a section 1 conspiracy. Where the entities possess an inherent unity of economic interest and purpose, they are not separate entities capable of conspiring. Thus, if you find that NWA, Inc., Northwest, and [Mainline] lacked independent economic consciousness after they had decided to merge and before the merger was completed, they were not capable of conspiring together at that time.
 
 
 48
 International contends that these instructions were erroneous because the rule announced in Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752, 777, 104 S.Ct. 2731, 2744, 81 L.Ed.2d 628 (1984)--that a parent and its wholly owned subsidiary "are incapable of conspiring with each other for purposes of § 1 of the Sherman Act,"--cannot properly be applied to insulate from Sherman Act liability joint actions by two previously independent competitors taken after they had agreed to merge but before the merger had been consummated. International quotes the statement in Copperweld that "[b]ecause coordination between a corporation and its division does not represent a sudden joining of two independent sources of economic power previously pursuing separate interests, it is not an activity that warrants § 1 scrutiny." Id. at 770-71, 104 S.Ct. at 2741. International asserts that Northwest's agreement to acquire Mainline did "represent a sudden joining of two independent sources of economic power previously pursuing separate interests," and therefore is subject to section 1 of the Sherman Act.
 
 
 49
 In Pink Supply Corp. v. Hiebert, Inc., 788 F.2d 1313 (8th Cir.1986), this court, applying Copperweld, affirmed a district court's grant of summary judgment dismissing a complaint alleging a price-fixing and boycott conspiracy between a manufacturer and its four sales representatives. We "conclude[d] that viewed from the perspective of Hiebert's organization, the sales agents were so closely intertwined in economic interest and purpose with Hiebert as to amount to a unified economic consciousness incapable of conspiring with itself. We reach this conclusion notwithstanding the representatives' separate ownership and incorporation." Id. at 1317. In so ruling, we pointed out that "[t]he economic substance of the relationship between two entities determines whether they are 'separate' for purposes of a section 1 conspiracy." Id. at 1316.
 
 
 50
 In the present case, the district court left it to the jury to determine whether, following the agreement to merge, but before the merger formally was effected, the "economic substance of the relation" between Northwest and Mainline meant that they no longer were "separate entities" because they "lacked independent economic consciousness." That ruling was a proper application of Pink Supply. We do not conclude, as International would have us do, that only the formal consummation of a merger precludes the application of section 1 of the Sherman Act to an alleged conspiracy between the merging companies.
 
 
 51
 In Pink Supply, we noted "an exception to the general principle that a corporation cannot conspire with agents of this kind. When the interests of principal and agents diverge, and the agents at the time of the conspiracy are acting beyond the scope of their authority or for their own benefit rather than that of the principal, they may be legally capable of engaging in an antitrust conspiracy with their corporate principal." Id. at 1317. International cannot rely upon this exception to subject the alleged conspiracy between Northwest and Mainline to section 1 of the Sherman Act. Although International correctly points out that before these two companies had agreed to merge, their interests were divergent and competing, that situation completely changed once the merger was agreed upon. In these circumstances, the "exception" noted in Pink Supply is inapplicable.
 
 
 52
 International also contends that City of Mt. Pleasant, Iowa v. Associated Elec. Coop., Inc., 838 F.2d 268 (8th Cir.1988), compels a different conclusion. There we upheld a district court's grant of summary judgment under Copperweld dismissing an antitrust charge against a group of cooperatives that, although separate corporations, constituted a rural electric cooperative. We held that "[t]he record bears out defendants' claim that the cooperative organization is a single enterprise pursuing a common goal--the provision of low-cost electricity to its rural consumer-members." Id. at 276. In so holding, we relied on the absence of evidence that "any of the defendants has pursued interests diverse from those of the cooperative itself. By 'diverse' we mean interests which tend to show that any two of the defendants are, or have been, actual or potential competitors." Id. (citation omitted). We do not read that language, however, as precluding the conclusion that the Sherman Act also is inapplicable to the alleged conspiracy between Northwest and Mainline during the period between their agreement to merge and the formal merger.
 
 
 53
 2. Instruction 41. Instruction 41 told the jury:
 
 
 54
 Anticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition.
 
 
 55
 International contends that the instruction "is a patently incorrect statement of the law, and virtually directed a verdict for defendants on [International's] Winter '86 and Bulk [seats rather than charters] antitrust damage claims." (Footnote omitted).
 
 
 56
 We disagree. The instruction is identical to the statement in Morgan. 892 F.2d at 1358. International tries to distinguish Morgan as "a predatory pricing case. Predatory pricing is ipso facto anticompetitive conduct because predatory pricing does not have any legitimate business purpose." The Morgan statement that instruction 41 adopted, however, was a general definition of anticompetitive conduct and was not limited to the particular type of anticompetitive conduct (predatory pricing) involved in that case. Although the district court could have expanded upon that definition and explained in greater detail the various factors the jury should consider in determining whether the defendants' conduct was anticompetitive, its failure to do so and its limiting the instruction to the statement made in Morgan were not erroneous.
 
 
 57
 3. Acquisition of Republic and Mainline. As noted, International does not challenge either the district court's grant of summary judgment rejecting the claim that NWA's acquisition of Republic violated section 7 of the Clayton Act, or the jury's rejection of the same statutory claim regarding NWA's acquisition of Mainline. It contends, however, that the jury instructions regarding these two acquisitions were improper because they failed to tell the jury that it could consider the acquisitions, even if legal, as steps by which Northwest obtained or attempted to obtain illegal monopoly power.
 
 
 58
 The district court, after telling the jury that NWA's acquisition of Republic "itself is lawful and does not violate the antitrust laws," charged the jury in instruction 44:
 
 
 59
 You are not to consider the Republic acquisition as evidence of unlawful conduct in this case. You may consider, however, any conduct occurring after the Republic merger in determining whether there has been a violation of the antitrust laws.
 
 
 60
 With respect to NWA's acquisition of Mainline, the court gave detailed instructions regarding section 7 of the Clayton Act.
 
 
 61
 International argues that illegal monopolization may be established by showing the acquisition of monopoly power through acquisitions that themselves do not violate section 7 of the Clayton Act (or, a fortiori, do not violate section 1 of the Sherman Act, cf. United States v. First Nat'l Bank & Trust Co. of Lexington, 376 U.S. 665, 84 S.Ct. 1033, 12 L.Ed.2d 1 (1964)). International cites no case so holding and we know of none. International's broad statement that "[o]ver the entire history of the Sherman Act, lawful conduct has been held to be a means of willful acquisition and/or maintenance of monopoly power, that is, of monopolization," does not address the narrower issue here involved.
 
 
 62
 "In order to establish a § 2 Sherman Act violation a plaintiff must show that: (1) the defendant possessed monopoly power in the relevant market; (2) the defendant willfully acquired or maintained this monopoly power by anticompetitive conduct." Morgan, 892 F.2d at 1358. International's argument relates only to the second factor, which requires a showing that Northwest acquired or maintained monopoly power "by anticompetitive conduct." International's contention does not satisfy this requirement.
 
 
 63
 Any error in failing to give the instruction was harmless with respect to two of International's three monopolization claims. International's contention relates only to the second element of monopolization--the way in which monopoly power was acquired or retained. With respect to the 1986 winter season claim, the jury found that Northwest did not possess monopoly power in the relevant markets prior to or during that season. Thus, any question regarding the means by which Northwest acquired or retained monopoly power was irrelevant.
 
 
 64
 With respect to the 1988 summer season claims, the jury found that Northwest had monopolized by "wilfully acquir[ing] or maintain[ing] monopoly power ... through anticompetitive conduct" and had attempted to monopolize by "engag[ing] in anticompetitive conduct with the goal of achieving monopoly power." We have reversed those monopolization findings, because of the lack of evidence to show the anticompetitive conduct upon which they rested--predatory pricing. The reversal, however, does not gainsay the fact that, despite the lack of the instruction that International says should have been given, the jury nevertheless found for International on its section 2 claim for the 1988 summer season.
 
 
 65
 The jury found that with respect to the "bulk" claim (blocks of seats on scheduled flights), Northwest had not "wilfully acquired or maintained monopoly power in any relevant market through anticompetitive conduct." This finding accords with the Morgan standard.
 
 
 66
 4. Exclusion of Evidence and Limitation of Testimony. International contends that the district court erroneously excluded three exhibits that it offered, PX 783, 392, and 811.
 
 
 67
 PX 783 was a report by a Republic employee who did not testify. The court excluded it as without foundation (since the author did not testify), as hearsay because it was a Republic document, and as irrelevant to Northwest, and not, as International asserts, "because it was authored at Republic." That ruling was proper.
 
 
 68
 PX 392 was a Northwest document discussing various aspects of the then contemplated Republic merger. International recognized that the Northwest merger "cannot be attacked here," but sought to introduce the document to show that, in making the acquisition, Northwest "knew" they "were getting a monopoly and ... intended to do that." The court excluded PX 392 "based upon rules 402 and 403" of the Federal Rules of Evidence. "Rule 403 ... allows a trial court in its discretion, to exclude relevant evidence if its probative value is substantially outweighed by the danger of unfair prejudice. A district court's determination respecting the admissibility of evidence under Rule 403 is paid great deference and its determination will not be reversed on appeal 'absent a clear and prejudicial abuse of discretion.' " United States v. Michaels, 726 F.2d 1307, 1315 (8th Cir.) (citations omitted), cert. denied, 469 U.S. 820, 105 S.Ct. 92, 83 L.Ed.2d 38 (1984). See also Ryan v. McDonough, 734 F.2d 385, 390 (8th Cir.1984). The district court did not abuse its discretion here.
 
 
 69
 PX 811 was a July 1990 General Accounting Office detailed study entitled: "AIRLINE COMPETITION Higher Fares and Reduced Competition at Concentrated Airports." The district court properly excluded it as irrelevant because it dealt with a time subsequent to the events involved in this case.
 
 
 70
 "[A] trial court's rulings on the admissibility of evidence are subject to review under the abuse of discretion standard." Brewer v. Jeep Corp., 724 F.2d 653, 657 (8th Cir.1983). See also Dillon v. Nissan Motor Co., 986 F.2d 263, 269 (8th Cir.1993) (evidentiary ruling within "strict discretion" of trial judge). In a big case such as this, in which a great many documents were admitted, we cannot say that the district court abused its discretion in excluding these three documents.
 
 
 71
 International also states that the court "incorrectly limited the direct examination of Dr. Borenstein and the cross examination of Dr. Fisher concerning PX 811," though it does not argue this issue on appeal. The court pointed out that if it exposed the jury to the report--which was "done by highly specialized people in a highly technical field"--it would then be required to have the jury "investigate" all of the technical documents underlying the report. This, the court correctly determined not to do.
 
 
 72
 5. Attorney's Fees and Costs. Our reversal in Part IIA in this opinion of the portion of the jury verdict that found for International on a part of its antitrust claims necessarily requires reversal of the district court's award of attorney's fees and costs under that verdict, and makes it unnecessary for us to consider International's contention that the award was inadequate.
 
 III. State Law Claims
 
 73
 A. Northwest's Appeal--International's Fraud Claims
 
 
 74
 In sustaining International's fraud claim, the jury found that
 
 
 75
 Northwest made a representation or omission to [International] regarding the 1986 winter season that was false as to a past or present material fact[;]
 
 
 76
 Northwest knew the representation or omission was false or made a representation or omission as of its own knowledge without knowing its truth or falsity[;]
 
 
 77
 Northwest intended for [International] to act upon the false representation or omission[; and][International] justifiably acted in reliance upon Northwest's false representation or omission[.]
 
 
 78
 International's claim of fraud rested on two misrepresentations it alleged Northwest made. According to International, Northwest made misrepresentations with respect to charters and equal treatment of International and Mainline, and also misrepresented that Mainline would not obtain use of a wide-bodied aircraft from another airline. International also alleged that Northwest had entered into a contract with it that incorporated as commitments those misrepresentations, and breached that contract. The jury, however, found against International on its breach of contract claim, and Northwest has not directly challenged that finding on appeal. Accordingly, the only substantive issue before us in this portion of the case is the validity of the jury's finding of fraud.
 
 
 79
 1. Equal Treatment of International and Mainline. Stephen Russell, International's president, testified that between 1979 and 1984, International operated charter flights with aircraft chartered from, among others, Northwest, and also purchased blocks of seats from airlines, including Northwest, on their scheduled service. Following congressional deregulation of the airline industry in 1978, International sold airline seats in direct competition with the scheduled airlines and other charter operators.
 
 
 80
 In late 1984 or early 1985, Russell discussed with Fay Beauchine, Northwest's Director of Marketing and Incentive Sales, the chartering exclusively to International (and not to Mainline) of a Northwest 747 aircraft for the 1986 winter season for Las Vegas. He discussed with her International "having the first call on wide body availability for the winter of 1986." International was not "looking for wide bodies anyplace else ... [b]ecause we had the first call with Northwest on availability." International had obtained wide-body charters from Northwest for the winter seasons in 1985, 1984 and 1983.
 
 
 81
 In the spring of 1985, after he "became aware of ... rumors relating to the Northwest acquisition of" Mainline, Russell had "other discussions" with Ms. Beauchine, in which she told him that "I still had the first call on wide-body availability for the winter of 1986, and that the exact equipment that would be available would be subject to aircraft availability of Northwest after they found out what their military commitments were going to be." In telephone conversations with her, he "received [her] assurances that we would have first call on availability of any charter aircraft for this winter." In a letter to Ms. Beauchine, he stated: "As agreed, we plan to repeat the program we operated with the 747s last year to Las Vegas, Hawaii and Orlando."
 
 
 82
 He subsequently wrote to Ms. Beauchine "to make sure that the agreement on the first call on wide-body aircraft that I had reached orally with Miss Beauchine would then be put in writing. And I wrote that letter to make sure that there was a record of what we had discussed and what we had agreed to, so that there would be no misunderstanding in the event that that acquisition of [Mainline] would ultimately go through and thereby lead to some other problem in the future." That time, International had not "looked anyplace else for wide-body aircraft for winter '86."
 
 
 83
 In a June 1985 telephone call, Mr. Skoog, Northwest's Director of Tour and Leisure Marketing, told Mr. Russell that Mainline "had been informed that they were not going to be able to get their aircraft from Transamerica [a charter air carrier], and that therefore Northwest was wanting to now supply aircraft to [Mainline], and that we had the need to discuss that because Northwest had a problem." It was Mr. Russell's "understanding" that Mr. Skoog had called "to inform me that [Mainline] had informed Northwest that they were not able to get Transamerica 747s, and therefore Northwest was going to be making 747s available, and that we had a problem that we had to discuss." In a subsequent meeting, Mr. Skoog told him which 747 aircraft Mainline "was going to have and then what would be left for me." When Russell told Skoog that on Monday and Friday, International wanted the 747s and Mainline "could have the DC-10. He said, 'No, [Mainline] wants the 747s on Monday Friday as well.' " Russell stated that
 
 
 84
 "... I don't want the DC-10 because that normally has a higher seat cost which is gonna put me at a disadvantage."
 
 
 85
 And in that context, Tim said "Well, we'll price the 747 and the DC-10 exactly the same." And I want to make sure you saw that I knew clearly that at that point both [Mainline] and [International] would have the same seat cost on the aircraft for either the 747 or the DC-10. And it was in that setting that I said "Okay, under those conditions, I'm willing to take the DC-10." I had then the DC-10 on Monday-Friday and [Mainline] was going to have the 747 on Sunday and Thursday.
 
 
 86
 According to Russell, at that meeting Skoog "assured me that the DC-10 would be priced the same as the 747," that "the price for the cost per seat that [Mainline] would be paying would be the same as the cost per seat that [International] would be paying." Mr. Skoog also told him that the departure times for the Mainline and International flights "would be the same" on Sundays and Thursdays because two 747s were available; that for other days, if one plane had a more favorable departure time than the other, Mainline and International "would alternate as far as departure times were concerned so that neither side would be sitting with an advantage in terms of departure times," and that International would have a charter for Wednesdays to Orlando, and that "no charter [or block of seats would be] given to [Mainline] to operate to Orlando." Russell stated that at that meeting he was "demanding what had been promised to me." Russell testified that, at the end of the meeting, Skoog told him that if he complained to the Department of Transportation about Northwest's proposed acquisition of Mainline, "all bets were off."
 
 
 87
 Although the jury found that Northwest made a misrepresentation to International regarding the 1986 winter season that was false "as to a past or present material fact," the foregoing statement of the evidence relating to that finding shows that any misrepresentations related not to past or present facts, but to what Northwest would do in the future. According to Russell's testimony, Northwest made promises to him regarding its future conduct: (1) that International would have a "first call" on Northwest's available charters, (2) that International and Mainline would be charged the same for the Las Vegas runs, (3) that Mainline would not receive better departure times than International, and (4) that Northwest would not provide blocks of seats to Mainline for service to Orlando.
 
 
 88
 International's fraud claims thus were for promissory fraud, which Minnesota law describes as a promise made with "no intention to perform at the time the promise was made." Hayes v. Northwood Panelboard Co., 415 N.W.2d 687, 690 (Minn.Ct.App.1987). See also Taubman v. Prospect Drilling & Sawing, Inc., 469 N.W.2d 335, 338 (Minn.Ct.App.1991), review granted and remanded, 472 N.W.2d 141 (Minn.1991). This was the claim that International pleaded in its complaint, which alleged that the representations of Northwest "were knowingly false when made" and "at all times Northwest Airlines intended to ignore its agreements with [International] to the benefit of Mainline Travel, and yet keep as much of [International's] business as possible so as to control [International]."
 
 
 89
 The general rule in Minnesota is that broken promises are not actionable as fraud. See Kramer v. Bruns, 396 N.W.2d 627, 631 (Minn.Ct.App.1986) ("Promises to act in the future do not form the basis for a fraud action."); H.J., Inc. v. International Tel. & Tel. Corp., 867 F.2d 1531, 1546 (8th Cir.1989) ("Minnesota law follows the general common law rule that in order to support a fraud claim, a misrepresentation must be of a present fact, not a future event."). The only exception is that a claim of promissory fraud may lie if, when the promise was made, the promisor then had no intention to perform it. H.J., Inc., 867 F.2d at 1546-47 ("a misrepresentation of a present intention could amount to a fraud"). To prevail on such a claim, however, the plaintiff must present "affirmative evidence" that the promisor had no intention to perform. Hayes, 415 N.W.2d at 690. Moreover, the rule is "well-settled" that "a representation or expectation as to future acts or events is not a sufficient basis to support an action for fraud merely because the represented act or event did not take place." Belisle v. Southdale Realty Co., 283 Minn. 537, 168 N.W.2d 361, 363 (Minn.1969). See also Rognlien v. Carter, 443 N.W.2d 217, 220-21 (Minn.Ct.App.1989); Ruzicka v. Conde Nast Publications, Inc., 733 F.Supp. 1289, 1301 (D.Minn.1990), aff'd, 939 F.2d 578 (8th Cir.1991). As the Minnesota Supreme Court explained in Crosby v. Crescent Oil Co., 192 Minn. 98, 255 N.W. 853 (1934):
 
 
 90
 "fraud cannot be predicated upon the mere fact that a promise has been broken.... There must be evidence to justify a trier of fact in concluding that, when the promise was made, there was no intention of performing it.... It would be as wrong morally as legally, as offensive to logic as to law, to hold that mere denial and nonperformance are evidence that, if a promise was made, it was made fraudulently.... Bad, indeed, would be the case of the honest man who has made no such promise if, when falsely charged with it, he may not deny it without having his truth considered as some evidence either that there was such undertaking or that it was deceitfully made."
 
 
 91
 Id. 255 N.W. at 857 (citation omitted).
 
 
 92
 The evidence in this case was insufficient to show that Northwest officials made those promises with no intention to perform them. There was lacking here the "affirmative evidence" of intention not to perform that is an essential component of a claim of promissory fraud in Minnesota. For example, there was no showing that at the time of the promises Northwest would have been unable to perform them or had already taken action that was inconsistent with its commitments, such as having entered into arrangements with Mainline to favor the latter over International. Cf. Benson v. Rostad, 384 N.W.2d 190, 195 (Minn.Ct.App.1986) (jury reasonably could conclude that "Rostad did not believe he could prepare both parties' fields simultaneously"). The only evidence supporting International's claim was that Northwest failed to perform. Under Minnesota law, however, such evidence was insufficient to show contemporaneous intention not to perform the promises.
 
 
 93
 2. The Transamerica Aircraft. Alternatively, International argues that the jury's fraud finding may be sustained by reference to Skoog's statement in his telephone conversation with Russell that Northwest would provide wide-bodies to Mainline because the latter had told Northwest that it could not obtain airplanes from Transamerica. The allegedly false statement was that Mainline had so told Northwest. If that evidence is sufficient to support the jury verdict, this would call for a remand for a new trial, not an affirmance of the jury verdict. We have held that the verdict, if based upon the first theory, cannot stand. Thus, despite International's theory with regard to the Transamerica aircraft misrepresentation, the jury verdict may have rested upon the first theory. See Ryko Mfg. Co. v. Eden Servs., 823 F.2d 1215, 1236 (8th Cir.1987) ("Because we have no way of knowing which of the fraud theories the jury relied upon in rendering its verdict, each of the theories must be supported by sufficient evidence to create a jury question on that theory."), cert. denied, 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988).
 
 
 94
 This alternative theory, however, also is fatally flawed. The theory is not subject to the defect that invalidated the first theory, since the statement here relates to an existing fact (what Mainline told Northwest) and did not involve promises of future conduct. The flaw, however, is that the evidence does not support the jury's findings that Northwest intended International to act upon the alleged misrepresentation and that International justifiably acted in reliance thereon.
 
 
 95
 In context, the statement was made to explain why Northwest would supply wide-bodied aircraft to Mainline, and not to dissuade International from itself seeking such aircraft from Transamerica. When Russell was told that Mainline "had been informed that they were not going to be able to get their aircraft from Transamerica, and that therefore Northwest was wanting to now supply aircraft to [Mainline]," Russell says he responded as follows:
 
 
 96
 Q. And what did you say?
 
 
 97
 A. I said, " 'We' don't have a problem. You have a problem."
 
 
 98
 Q. And did you explain that reference to Mr. Skoog?
 
 
 99
 A. Yes, I did. I said "I have first call on the aircraft and I'm looking to have that first call honored, and I don't care about [Mainline's] problem getting aircraft from Transamerica."
 
 
 100
 Thus, even assuming that Skoog's statement regarding what Mainline told Northwest about inability to obtain the Transamerica planes was false, any "injury" that International may have suffered resulted from Northwest supplying the plane to Mainline (instead of to International), and not from Northwest's reason for doing so.
 
 
 101
 International contends that Skoog's statement "induced" it "to not seek a 747 from Transamerica, to its damage." The only evidence it cites to support that conclusion--Russell's testimony--does not do so. Russell stated:
 
 
 102
 Q. How did the meeting end up from your point of view? Can you summarize for us what had happened at the meeting and what your state of mind was as to why it had?
 
 
 103
 A. Well, I was being faced with an immediate decision. I was either going to take what was being offered to me or have to pursue litigation. That was my state of mind in terms of what as [sic] happening.
 
 
 104
 Number two, I had the information that Transamerica's wide body was not going to be available to [Mainline], and I took that at face value. And I'm looking at the fact that here I'm sitting at the end of June, and as far as I was concerned, there weren't going to be any good options. I had been flying the Northwest 747 product for a number of years. It's a product that was proven successful. I wasn't aware of any other opportunity at that time. So short of suing, I was taking what was being offered at that point.
 
 
 105
 Nothing in this statement indicates that, as a result of Skoog's statement regarding the unavailability of the Transamerica wide-body to Mainline, International refrained from seeking such a plane from Transamerica or another source. Indeed, the inference that International seeks to draw from that statement is inconsistent with and contradicted by Russell's testimony, quoted above, that he did not "care about [Mainline's] problems getting aircraft from Transamerica" because he believed he had "first call" on the Northwest planes.
 
 
 106
 Moreover, an internal International memorandum, written less than a month later, indicates that International did not rely on Skoog's statement as a reason to refrain from seeking the Transamerica aircraft, but itself unsuccessfully had sought it. The memorandum states "the results to date in our efforts to obtain winter charter aircraft availability" from 25 named airlines. With respect to Transamerica, it stated: "Nothing available."
 
 
 107
 3. Damages. Since we conclude that the award of damages based upon the fraud count cannot stand, we need not consider Northwest's argument that the additional punitive damages award was improper.
 
 B. International's Appeal
 
 108
 1. The Court's Answer to a Jury Question. As noted, International has not appealed from the jury's verdict against it on its breach of contract claim, based on International's alleged breach of the "first call contract." In its cross-appeal, however, International contends that the district court's answer to a question from the jury was incomplete and erroneous, and prejudicial to International.
 
 
 109
 During its deliberations, the jury asked the court the following question:
 
 
 110
 Is it legal to put wording into a contract that says, in essence, "we will not be bound by this contract until it is signed"?
 
 
 111
 The court answered, "Yes."
 
 
 112
 International does not deny that the answer was correct. Parties to an agreement may agree that they will not be bound until the agreement is signed. Dataserv Equip., Inc. v. Technology Fin. Leasing Corp., 364 N.W.2d 838, 841 (Minn.Ct.App.1985) ("[W]here the parties know that the execution of a written contract was a condition precedent to their being bound, there can be no binding contract until the written agreement was executed."). See also Northway v. Whiting, 436 N.W.2d 796, 799 (Minn.Ct.App.1989). International argues, however, that the answer gave the jury a "misleading impression about the 'first call' contract," because "a simple answer 'yes' to the jury's question might have been taken by the jury as indicating that that [sic] terms of the form charter contract might affect the enforceability of this separate contract."
 
 
 113
 "The response to a jury request for supplemental instructions is a matter within the sound discretion of the district court." United States v. White, 794 F.2d 367, 370 (8th Cir.1986). The district court did not abuse its discretion in giving the single word correct answer to the jury's simple question, and in not expanding the answer as International argues it should have done.
 
 
 114
 2. International's Additional Contentions. International also raises conditionally two issues that it states need be reached only if the verdict in its favor is disturbed.
 
 
 115
 a. Loss of Prospective Economic Relations. International states that it introduced evidence to show that, as a result of Northwest's failure to make available seats on the favorable terms Northwest had promised, it "lost prospective economic relations with air travel customers." It contends that because, at the close of the evidence, the court granted its motion to conform the pleadings to the proof, the court was required to instruct the jury that International was contending that Northwest had committed the tort of "intentional interference with prospective economic relations."
 
 
 116
 It is doubtful that these circumstances were sufficient properly to inject the issue into the case. In any event, the mere general loss of possible unspecified customers does not establish the tort of intentional interference with prospective economic relations under Minnesota law. See Hunt v. University of Minn., 465 N.W.2d 88, 95-96 (Minn.Ct.App.1991) (examining effect of defendant's wrongful act on actual relationship); Rickards v. Canine Eye Registration Found., Inc., 704 F.2d 1449, 1456 (9th Cir.) (a party must establish the existence of a "specific economic relationship between appellants and third parties that may economically benefit appellants"), cert. denied, 464 U.S. 994, 104 S.Ct. 488, 78 L.Ed.2d 683 (1983). See also Genetic Sys. Corp. v. Abbott Lab., 691 F.Supp. 407, 422 (D.D.C.1988) (plaintiff must plead "the existence of a valid business relationship or expectancy").
 
 
 117
 b. Hindering Performance of a Contract. International also contends that the district court erred in refusing to instruct and submit a special verdict question on "whether Northwest breached the four charter contracts with [International] by hindering [International's] performance under those contracts." The court instructed:
 
 
 118
 A breach of contract may occur by a failure to perform the acts promised in the contract, by preventing performance of the promised acts, or by repudiating or denying the contract.
 
 
 119
 International contends that the court should have instructed that Northwest also could have breached the contract by "hindering" as distinguished from "preventing" performance.
 
 
 120
 The district court's instructions were in accord with the weight of Minnesota law, which is that a party may breach the contract only by preventing or making impossible the other party's performance--not merely by making performance more difficult. See Knudsen v. Northwest Airlines, Inc., 450 N.W.2d 131, 133 (Minn.1990) ("[A] party who prevents performance by the other party may not benefit by so doing.") (emphasis added); Wild v. Rarig, 302 Minn. 419, 234 N.W.2d 775, 790 (1975) ("This court has read an implied condition of good faith into a nonsales contract containing reciprocal duties ... where one of the parties made it impossible for the other to perform....") (emphasis added), cert. denied, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). See also Haase v. Stokely-Van Camp, Inc., 257 Minn. 7, 99 N.W.2d 898, 902 (Minn.1959); Beer Wholesalers, Inc. v. Miller Brewing Co., 426 N.W.2d 438, 441 (Minn.Ct.App.1988), cert. denied, 489 U.S. 1039, 109 S.Ct. 1173, 103 L.Ed.2d 235 (1989); American Warehousing v. Michael Ede Management, Inc., 414 N.W.2d 554, 557 (Minn.Ct.App.1987).
 
 CONCLUSION
 
 121
 The judgment of the district court is reversed insofar as it awarded International damages for violation of section 2 of the Sherman Act and for fraud, and awarded attorney's fees and costs under section 4 of the Clayton Act. In all other respects, the judgment of the district court is affirmed.
 
 
 
 *
 DANIEL M. FRIEDMAN, of the United States Court of Appeals for the Federal Circuit, sitting by designation
 
 
 **
 The Honorable Paul A. Magnuson, United States District Judge for the District of Minnesota